**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Rhonda Boone, on behalf of herself and all others similarly situated,<br><br>　　　　　Plaintiff,<br>　v.<br><br>MB FINANCIAL BANK, N.A.,<br><br>　　　　　Defendant. | **CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED**<br><br>**CASE NO. 1:18-cv-1771** |

Plaintiff, RHONDA BOONE, on behalf of herself and all others similarly situated, sues Defendant, MB Financial, N.A., and alleges:

## INTRODUCTION

1.　　MB Financial Bank, N.A. ("MB Financial") operates one of the most aggressive and predatory overdraft fee programs in the country, seeking at every opportunity to turn its accountholders' financial struggles into bank revenue. Plaintiff Boone, like thousands of others, has fallen victim to the bank's take-no-prisoners overdraft fee revenue maximization scheme.

2.　　For perspective, consider the brutal impact MB Financial's overdraft fees ("OD Fees") have had on Plaintiff Boone. Plaintiff's sole income is approximately $1,100 a month, which represents public benefits from the Social Security Administration. Since 2015, MB has charged Ms. Boone a staggering $6,000 in OD Fees ($2,121.50 in 2015; $2,154 in 2016; and $1,806 in 2017). Thus, *nearly 18% of her total income in the last three years has been consumed by MB Financial's OD Fees.*

3.　　Ms. Boone presents a good example of MB's crushing and punitive OD Fee policies. Long ago, MB stopped being a bank providing services to Ms. Boone and instead became a financial predator taking from one of Chicago's neediest citizens to pad its own bottom line.

4.      These huge cumulative fees are comprised of both MB's $37 Overdraft Fee, which is the initial charge on supposed insufficient funds transactions, and its $6.50 "Continuous Day Overdraft" charge ("CDO Fees"), which it claims to charge when accountholders do not bring their account balance into positive status within two full days—but in fact charges sooner.

5.      Plaintiff seeks redress for three distinct unlawful practices that MB Financial perpetrates on its checking account customers to increase the OD Fees assessed on them. Plaintiff asserts this action under Fed. R. Civ. P. 23, on behalf of herself and all others similarly situated throughout the United States, for damages and other relief arising from MB Financial's routine practice of (a) assessing OD Fees on transactions that did not overdraw checking account available balances; (b) assessing CDO Fees prior to the time promised in the contract; and (c) abusing its discretion under the contract to repeatedly, routinely, and automatically authorize overdraft transactions even where it knows or should know that continued overdrafts will have devastating effects, especially when more than $1,000 in OD Fees are charged in a year.

6.      Besides being deceptive, unfair, and unconscionable, the practices breach promises or implied covenants in MB Financial's contract and are deceptive.

7.      Plaintiff and other MB Financial customers have been injured by MB Financial's practices.  On behalf of herself and the putative class, Plaintiff seeks damages and restitution for MB Financial's breach of contract and violations of state statute.  Additionally, Plaintiff seeks an injunction on behalf of the general public to prevent MB Financial from continuing to engage in its illegal and deceptive practices.

## PARTIES

8.      Plaintiff, Rhonda Boone, is a citizen and resident of the State of Illinois and has had a checking account with MB Financial at a branch in Illinois, at all times material hereto.

9.      MB Financial is a national bank with its U.S. headquarters and principal place of business located in Chicago, Illinois.  MB Financial also operates numerous retail banking centers throughout Illinois and in Indiana.  Among other things, MB Financial is engaged in the

business of providing retail banking services to consumers, including Boone and members of the putative classes.

## JURISDICTION AND VENUE

10.     This Court has original jurisdiction pursuant to the Class Action Fairness Act of 2005.  This Court has original jurisdiction under 28 U.S.C. §§ 1332(d)(2) and (6), because the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs, and at least one of the members of the proposed classes is a citizen of a different state than MB Financial.

11.     MB Financial regularly and systematically conducts business and provides retail banking services in this district, and provides retail banking services to its customers, including Plaintiff and members of the putative class.  As such, it is subject to the jurisdiction of this Court.

12.     Venue is likewise proper in this district pursuant to 28 U.S.C. § 1391 because MB Financial is subject to personal jurisdiction in this Court and regularly conducts business within this district through its principal place of business located in Chicago, Illinois and in numerous branches located within this district.  In addition, a substantial part of the events giving rise to the claims asserted herein occurred and continue to occur in this district.

## OVERVIEW

### I.  Improper Assessment of OD Fees

#### A.     MB's Practice

13.     A debit card transaction occurs in two parts.  First, authorization for the purchase amount is instantaneously obtained by the merchant from MB Financial.  When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to MB Financial, which verifies that the customer's account is valid and that available funds are sufficient to "cover" the transaction amount.

14.     At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, MB Financial immediately decrements consumers' checking accounts for the amount of the purchase and sets aside funds in a checking account to cover that

specific transaction. As a result, and with limited exceptions, customers' accounts *always* have sufficient available funds to cover these transactions throughout their entire life-cycle.

15.     However, MB Financial still assesses $37 OD Fees on many of these transactions, in violation of its contractual promises not to do so.

16.     Despite putting aside sufficient available funds for debit card transactions, MB Financial charges OD Fees on those same transactions if they purportedly settle—days later—into a negative balance ("Authorize Positive, Purportedly Settle Negative Transactions" or "APPSN Transactions").

17.     Here is how it works. MB Financial maintains a running account balance in real time, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instant they are made. When a customer makes a purchase with a debit card, MB Financial sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's account balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

18.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

19.     That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has been reduced to account for earlier debit card transactions.  This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

20.     Still, despite keeping those held funds off-limits for other transactions, MB Financial improperly charges OD Fees on APPSN Transactions—which always have sufficient available funds for payment.

21.     Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "deceptive" when:

> a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a

> reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Supervisory Highlights at 9 (Winter 2015).

22. There is no justification for these practices, other than to maximize MB Financial's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But MB Financial is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But MB Financial was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees by charging them on APPSN Transactions as well.

23. In plain, clear, and simple language, the checking account contract documents discussing OD Fees promise that the MB Financial immediately deducts funds from an account's available balance for "debit card transactions or other transactions that we are legally obligated to pay," and will <u>only</u> charge OD Fees on transactions with sufficient funds to "cover" a transaction—together, the provisions mean there are always sufficient funds to "cover" a transaction authorized on sufficient available funds:

> An overdraft occurs when you do not have enough **money available in your account to cover** a transaction, but we pay it anyway.

> Our standard overdraft practice comes with your account and allows us to use our discretion when paying items that will overdraw your account.

> **ATM or everyday debit card transactions that overdraw your account may be declined**, unless you sign up for Guard My Card, a service that, at our discretion, pays these types of transactions

> (overdraft related fees apply). If your transaction is declined, no
> fee is charged.
>
> […]
>
> Insufficient Funds and Overdraft Related Fees Overdraft Fee
> …$37 per item…**To determine your available balance**, subtract
> (1) deposits that are not yet available for withdrawal under our
> Funds Availability Policy, **(2) debit card or other transactions
> that we are legally obligated to pay or have already paid out in
> cash,** (3) other pending transactions such as ACH transactions, and
> (4) any holds on your balance, such as holds on funds to comply
> with court orders or other legal requirements.

Exhibit 1, MB Financial's "Overdraft Disclosure" (Exhibit 1) and "Fee Schedule" (Exhibit 2)
(emphasis added).

24.     For APPSN transactions, which are immediately deducted from a positive account
balance and held aside for payment of that same transaction, there are always funds to pay those
transactions—yet MB Financial assesses OD Fees on them anyway.

25.     In short, MB Financial is not authorized by contract to charge OD Fees on
transactions that have not overdrawn an account, but it has done so and continues to do so.

### B.     The Account Documents Fundamentally Misconstrue MB Financial's True Overdraft Fee and Debit Processing Practices

26.     The Account Documents misconstrue MB Financial's true debit card processing
and OD Fee practices in at least two ways.

27.     <u>First</u>, and most fundamentally, MB Financial charges OD Fees on debit card
transactions for which there are sufficient available funds to pay the transactions. That is despite
contractual representations that MB Financial will <u>only</u> charge OD Fees on transactions with
insufficient available funds to pay a given transaction and that the bank will immediately deduct
or place a hold on funds for such transactions.

28.     MB Financial assesses OD Fees on APPSN Transactions that ***do*** have sufficient
available funds to pay them throughout their lifecycle.

7

29.     Those available funds are sequestered at the moment a debit card transaction is approved by MB Financial.

30.     MB Financial's practice of charging OD Fees even where sufficient available funds exist to pay a transaction violates a contractual promise not to do so.  This discrepancy between MB Financial's actual practice and the contract causes consumers like Plaintiff to incur more OD Fees than they should.

31.     Sufficient funds for APPSN Transactions actually are debited from the account immediately, consistent with standard industry practice.

32.     Because these withdrawals take place upon initiation, they cannot be re-debited later.  But that is what MB Financial does when it re-debits the account during a secret batch posting process.

33.     In reality, MB Financial's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and at the time of settlement.

34.     At the time of settlement, however, an available balance *does not change at all* for these previously authorized transactions.  As such, MB Financial cannot then charge an OD Fee on such a transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

35.     Upon information and belief, something more is going on: When a debit card transaction is getting ready to settle, MB Financial does something new and unexpected, in the middle of the night, during its nightly batch posting process (explained further below).  Specifically, MB Financial releases the hold it had placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

36.     This secret step allows it to charge overdraft fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which MB Financial specifically set aside money to pay them.

37.     This discrepancy between MB Financial's actual practices and the contract causes consumers to incur more OD Fees than they should.

38.     <u>Second</u>, the bank promises to make overdraft determinations only at the time it elects whether or not to pay an overdraft. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. According to the "must-pay" network rule, once MB Financial authorizes a debit card transaction, it has no choice but to pay it.  It cannot change its mind later.

39.     In short, MB Financial promises that it will make overdraft fee determinations at the time of authorization.  That means that APPSN Transactions rightly cannot incur overdraft fees.

40.     In sum, there is a yawning gap between MB Financial's practices as described in the account documents and MB Financial's practices in reality.

C.      **Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately**

41.     The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions.  That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

42.     MB Financial was and is aware that this is precisely how its accountholders reasonably understand debit card transactions to work.

43.     MB Financial well knows that many consumers prefer debit cards for these very reasons.  Consumer research indicates that consumers prefer debit cards as a budgeting device; because they don't allow debt like credit cards do; and because the money comes directly out of a checking account.

44.     Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear."[1]

45.     Further, Consumer Action informs consumers that, "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full."

46.     This is a large part of the reason that debit cards have risen in popularity.  The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[2]

47.     Not only have consumers increasingly substituted from cash to debit cards, but they believe that a debit cards purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

48.     MB Financial was aware of a consumer perception that debit transactions reduce an available balance *in a specified order*—namely, the order the transactions are actually initiated—and its account agreement only supports this perception.

---

[1]     *See* http://www.consumeraction.org/helpdesk/articles/what _do_i_need_to_know_about_using_a_debit_card (last visited June 8, 2016).

[2]     Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MARKETWATCH, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

### D. **Plaintiff Boone's Overdraft Fee Experience**

49.     On May 13, 2015, January 6, 2016, July 6, 2017, February 8, 2018, and on other occasions, Plaintiff Boone was assessed OD Fees on debit card transactions that were, upon information and belief, initiated on or prior to each of those dates on  sufficient funds.  The same pattern occurred on March 6, 2017.

50.     Plaintiff Boone disputes that MB Financial was authorized to charge OD Fees on the prior in time debit card transactions initiated on sufficient funds.

51.     MB Financial assessed OD Fees on the held transactions even though it had sequestered available funds for those transactions at the time they were authorized.

### II. **Early Assessment of CDO Fees**

52.     The separate CDO Fee that MB Financial charges is deducted from a customer's account *in addition to* an initial overdraft fee.  According to the account contract, the CDO Fee will be assessed if and when the customer's overdraft status remains in effect for a period of two full business days after the account balance goes negative.  In reality, MB Financial assesses this fee <u>before</u> two full business days have passed, in violation of the contract.

53.     While other banks charge a "continuous" or "extended" overdraft fee like the CDO Fee, no other bank in the country has a more aggressive practice than MB with respect to this additional fee.  While most banks wait to assess such fees until 5 days or one week after a balance goes into overdrawn status, MB provides shockingly little time for consumers to recover from an overdraft.  MB purports to assess its $6.50 CDO Fee just two days later—and then every day thereafter for up to 16 days if the account remains overdrawn.  But the bank actually assesses the CDO Fee even earlier than that, as discussed below.

54.     According to MB's Fee Schedule:

> Continuous Day Overdraft . . . . This fee is charged beginning on
> the second consecutive calendar day the account is negative by
> more than $10.

55.     The common, plain meaning of this contract provision does not authorize MB to assess the CDO Fee until *two full calendar days after an account goes negative*.  In our legal system and in our culture more broadly, counting begins on the day after a triggering event. Under the Federal Rules of Civil Procedure and Appellate Procedure, one calculates deadlines starting the day after a triggering event. *See, e.g.,* Federal Rule of Appellate Procedure 26(a) ("When the period is stated in days or a longer unit of time…exclude the day of the event that triggers the period).

56.     If, for example, an account is determined to be negative at the end of the day on a Monday, MB's contract means it is prohibited from assessing a CDO Fee until Wednesday, at the earliest.  But MB actually charges the CDO Fee, as a matter of practice, on *the very next day after an account is overdrawn*, in violation of its contract and reasonable consumer's understanding.

57.     This commonsense meaning of MB's contract is bolstered by the realities of the banking industry processes at issue here.  Ledger balances on checking accounts are calculated after a business day ends, often during a process called "nightly batch processing" wherein credits and debits are tallied to an account.  Therefore, the first full business day that an account may be in a negative balance status is the next day after such batch processing.

58.     Indeed, MB does not even determine ledger balances or post transactions over weekends because such days are not "business days."  Neither deposits nor credits post to account on non-business days.  This means that if, at end on day on a Friday MB determines there is an overdrawn balance, there is virtually no way to avoid a CDO Fee, since no deposit can be made on a Saturday or a Sunday.

59.     Moreover, the bank makes clear that it does not determine overdrafts until <u>after a business day</u> is over in the Overdraft Disclosure:

Here are the ways you can cover an overdraft before incurring an overdraft fee:

- Deposit cash or a check drawn on another MB account at one of our Banking Centers before they close

- Deposit cash at any of our ATMs before 7pm CT

- Use online or mobile banking to transfer funds from another MB account by 7pm CT.

Ex. 2.

60.     In short, MB's late-at-night overdraft determination cannot possibly count as one of the two "consecutive calendar days" necessary to properly trigger a CDO Fee under the contract.  Indeed, a "second consecutive calendar day" has not been completed until there have been two full calendar days of an overdrawn balance.

61.     This reasonable contract interpretation is bolstered by the fact of MB's own practice with respect to the assessment of OD Fees, which does not occur until the *following* day after the overdraft transaction is posted to an account:

> These [OD Fees] are not charged unless your account is negative
> by more than $10 and will be deducted from the account the
> business day following the overdraft.

62.     With respect to Plaintiff Boone, as an example, sometime after the day ended on December 7, 2017, MB Financial determined that she had an overdrawn balance.  But it did not wait two full calendar days to charge a CDO Fee.  Instead, MB charged her a CDO Fee *the very next day*, on December 8, 2017—*less than 32 hours after the bank determined Plaintiff's account was overdrawn*.  It then proceeded to charge her an additional numerous other CDO Fees over the next several days.  Because it charged the first CDO Fee one day too soon, it breached the contract and charged Plaintiff at least one more CDO Fee than it should have.

63.     As another example, Plaintiff Boone experienced the same pattern occurred on February 5 and 6, 2018, and on dozens of other occasions over the last 4 years.

### III.     Abuse of Discretion in Repeatedly Authorizing Transactions that Resulted in Thousands of Dollars in OD Fees

64.     As discussed above, MB Financial has taken nearly 20% of Plaintiff's income in the form of OD Fees over the last four years.  It has done so by repeatedly and automatically

authorizing transactions that would incur overdraft fees. Knowing that overdraft fees are difficult or impossible to recover from for low-income consumers, MB freely provided Ms. Boone with virtually unlimited overdrafts, almost never using its discretion to deny overdraft transactions—and driving Ms. Boone into a inextricable cycle of debit and overdrawn balances.

65. MB's overdraft fees soon became the primary cause of thousands of dollars in further overdraft fees—a crippling cycle of fees on fees that fixed-income consumers cannot weather.

66. Further perspective is provided by this staggering fact: even though Plaintiff was charged nearly $4,000 in overdraft fees in 2016 and 2017, the only reason she was assessed any overdraft fees was because her account balance had been decimated in the prior year by over $2,000 in overdraft fees. Specifically, in *2015*, MB charged Plaintiff over $2,000 in overdraft fees. In *2016*, she was assessed dozens upon dozens of overdraft fees as well, but never once was her account balance negative by more than $797. That means if MB had assessed even half the amount of overdraft fees it did in 2015, Ms. Boone would have incurred no overdraft fees in either 2016 or 2017—a savings of $4,000, or four full months of the Social Security benefits intended by the public to help Ms. Boone survive.

67. None of this had to happen, because MB specifically gave itself the discretion to deny overdraft transactions:

> **We do not guarantee that your overdraft transaction will be paid, in which case the transaction will be declined or returned unpaid**. If the item is paid, you will be charged an Overdraft Fee. If the item is returned, you will be charged a Returned Item Fee. You agree to immediately repay us the amount of any overdraft, including fees. **Some examples of transactions that we use our discretion to pay or return include: Checks Automatic payments (i.e., phone bill, utility bill or car payment) Recurring debit card purchases (i.e., gym memberships or music subscriptions).** ATM or everyday debit card transactions that overdraw your account may be declined, unless you sign up for Guard My Card, **a service that, at our discretion, pays these types of transactions (overdraft related fees apply).** If your transaction is declined, no fee is charged.

68. MB promised to use its discretion fairly. It stated that it "may" deny overdraft transactions. It almost never did. Instead, it knowingly left the spigot open, because there was a profit to be made.

69. Of course, overdraft approval decisions are automated at a bank the size of MB Financial.

70. The bank uses a computer program or "Matrix" to assign a unique credit limit on each checking account, and that Matrix is designed to maximize overdraft fee revenue for the bank.

71. As the CFPB has stated:

> Generally, institutions that set overdraft coverage limits assign a single limit to each account and use that account limit for making decisions regarding check and ACH transactions during nightly processing as well as for authorizing ATM and POS debit card transactions for those accounts opted in for overdraft coverage on these items…Many institutions set dynamic limits based on a 'matrix' or set of formulas that weigh various account and accountholder characteristics in an attempt to manage more precisely account credit risk, overdraft program revenues, and customer retention. These characteristics commonly include account tenure, average balance, overdraft history, and deposit patterns as well as other relationships the accountholder may have with the institution. Limits assigned to accounts at institutions using dynamic overdraft limits may change over time as an accountholder's usage patterns and relationship to the institution change. Thus the distribution of limits assigned to accounts by an institution may change based on changes in policy, customer behavior, and market conditions that affect both, and banks report periodically evaluating and adjusting their algorithms for setting dynamic coverage limits.

72. Based on Plaintiff Boone's experience, it is clear that MB Financial's "matrix" weighed none of the factors discussed by the CFPB, except for one: overdraft fee revenue.

73. MB Financial's "matrix" is programmed to maximize OD fees at all costs. So while MB feigned in its disclosure that it would use is discretion to authorize overdraft transactions fairly, it did not. It used that discretion to gouge consumers like Plaintiff.

## CLASS ALLEGATIONS

74.     Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.  The proposed classes are defined as:

> All MB Financial checking account holders who, within the applicable statute of limitations, were charged OD Fees on transactions that were authorized into a positive available balance (the "APPSN Class").

> All holders of a MB Financial checking and/or money market account who, within the applicable statute of limitations, incurred one or more CDO Fees before two full business days had passed (the "CDO Fee Class").

> All holders of a MB Financial checking and/or money market account who, within the applicable statute of limitations, incurred more than $1,000 in OD Fees in a given year (the "Excessive OD Fee Class").

In addition, the proposed Illinois subclasses are defined as follows:

> All MB Financial checking account holders in the state of Illinois who, within the applicable statute of limitations, were charged OD Fees on transactions that were authorized into a positive available balance (the "Illinois APPSN Class").

> All holders of a MB Financial checking and/or money market account in the state of Illinois who, within the applicable statute of limitations, incurred one or more CDO Fees before two full business days had passed (the "Illinois CDO Fee Class").

> All holders of a MB Financial checking and/or money market account in the state of Illinois who, within the applicable statute of limitations, incurred more than $1,000 in OD Fees in a given year (the "Illinois Excessive OD Fee Class").

The Illinois AAPSN Class, the Illinois CDO Fee Class, and the Illinois Excessive OD Fee Class are collectively referred to as the "Illinois Subclasses." All of the classes are collectively referred to as the "Classes."

75.     Plaintiff brings this action on her own behalf and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23.  Excluded from the class are MB Financial, its subsidiaries and affiliates, its officers, directors and member of their immediate families and any entity in which defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

76.     Plaintiff reserves the right to modify or amend the definition of the proposed Classes if necessary before this Court determines whether certification is appropriate.

77.     This case is properly brought as a class action under Fed. R. Civ. P. 23(a) and (b)(3), and all requirements therein are met for the reasons set forth in the following paragraphs.

78.     *Numerosity under Fed. R. Civ. P. 23(a)(1)*.  The members of the Class are so numerous that separate joinder of each member is impracticable.  Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to MB Financial's records.  MB Financial has the administrative capability through its computer systems and other records to identify all members of the Class and the amount of OD Fees and CDO Fees paid by each Class member, and such specific information is not otherwise available to Plaintiff.

79.     *Commonality under Fed. R. Civ. P. 23(a)(2)*. There are numerous questions of law and fact common to the Class relating to MB Financial's business practices challenged herein, and those common questions predominate over any questions affecting only individual Class members.  The common questions include, but are not limited to:

a)      Whether MB Financial improperly charged overdraft fees on APPSN Transactions;

b)      Whether MB Financial improperly assessed CDO Fees before contractually authorized to do so;

c)  Whether MB Financial developed and engaged in an unlawful practices that mischaracterized or concealed its true overdraft fee practices; and

d)  Whether Plaintiff and other members of the Class have sustained damages as a result of MB Financial's assessment and collection of the CDO Fees, and the proper measure of damages.

80.  *Typicality under Fed. R. Civ. P. 23(a)(3)*.  Plaintiff's claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practice by MB Financial, as described herein.

81.  *Adequacy of Representation under Fed. R. Civ. P. 23(a)(4)*.  Plaintiff is an adequate representatives of the Class in that she has an MB Financial checking account and has suffered damages as a result of MB Financial's assessment and collection of OD Fees and CDO Fees.  In addition:

a)  Plaintiff is committed to the vigorous prosecution of this action on behalf of herself and all others similarly situated and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

b)  There is no hostility of interest between Plaintiff and the unnamed Class members;

c)  Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

d)  Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

82.  *Predominance under Fed. R. Civ. P. 23(b)(3)*. The questions of law and fact common to the Class as set forth in the "commonality" allegation above predominate over any individual issues.  As such, the "commonality" allegations (paragraph 73 and subparts) are restated and incorporated herein by reference.

83.     *Superiority under Fed. R. Civ. P. 23(b)(3).*  A class action is superior to other available methods and highly desirable for the fair and efficient adjudication of this controversy. Since the amount of each individual Class member's claim is very small relative to the complexity of the litigation and since the financial resources of MB Financial are enormous, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and MB Financial's misconduct will proceed without remedy.  In addition, even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

84.     All conditions precedent to bringing this action have been satisfied and/or waived.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract)**
**(On Behalf of the APPSN Class and CDO Fee Class)**

85.     Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

86.     Plaintiff and MB Financial Bank have contracted for bank account deposit, checking, ATM, and debit card services.

87.     MB Financial Bank misconstrued in the account documents its true debit card processing, OD Fee, and CDO Fee practices and breached the express terms of the account documents.

88.     MB Financial Bank breached promises included in the account documents.

89.     No contract provision authorizes MB Financial Bank to charge OD Fees on APPSN Transactions. Rather, the contract only authorizes MB Financial Bank to charge OD Fees on transactions for which sufficient funds did not exist at the time of authorization.

90.     Therefore, MB Financial Bank breached the terms of its account documents by charging OD Fees on transactions that were authorized into a sufficient available balance, but whose available balances were allegedly insufficient at the time the transactions were settled.

91.     No contract provision authorizes MB Financial Bank to charge CDO Fees on the day after an account balance is determined to be negative. Rather, the contract only authorizes MB Financial Bank to charge CDO Fees after two full days have passed.

92.     Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

93.     Plaintiff and members of the Classes have sustained damages as a result of MB Financial Bank's breach of the contract.

## SECOND CLAIM FOR RELIEF
### (Breach of the Covenant of Good Faith and Fair Dealing)
### (On Behalf of the Classes)

94.     Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

95.     Plaintiff and MB Financial Bank have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in contract documents.

96.     Under the law of Illinois, good faith is an element of every contract pertaining to the assessment of OD Fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit — not merely the letter — of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to

its form.  Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

97.   Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

98.   MB Financial Bank has breached the covenant of good faith and fair dealing in the contract through its overdraft policies and practices as alleged herein.

99.   Specifically, MB Financial Bank harms consumers by abusing its contractual discretion in a number of ways which no reasonable consumer would anticipate.

100.   MB Financial Bank uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

101.   MB Financial Bank uses this contractual discretion to extract OD Fees on transactions that no reasonable consumer would believe could cause OD Fees, and to extract excessive and unconscionable OD Fees.

102.   MB Financial interprets and applies contract terms in a way no reasonable consumer would anticipate when it charges CDO Fees on the day after an account is determined to be negative.

103.   MB Financial abuses its contractual discretion to approve or decline overdraft transactions by programming its "matrix" to maximize overdraft fee revenue at all costs, and to repeatedly authorize transactions that result in thousands of dollars of overdraft fees each year.

104.   Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the account documents.

105.   Plaintiff and members of the Classes have sustained damages as a result of MB Financial Bank's breach of the covenant of good faith and fair dealing.

<u>**THIRD CLAIM FOR RELIEF**</u>

**(Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*.)**
**(On Behalf of the Illinois Subclasses)**

106.    Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

107.    MB Financial engaged in deceptive and unfair acts or practices relating to the imposition of OD Fees and CDO Fees on consumers in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA").

108.    The express purpose of the ICFA is to "protect consumers" "against fraud, unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . ." 815 ILCS 505/1.

109.    Plaintiff and class members are "consumers" within the meaning of 815 ILCS 505/1(e).

110.    Defendant was engaged in "trade or commerce" as defined by 815 ILCS 505/1(f).

111.    ICFA declares unlawful "unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omissions of such material fact. . . in the conduct of any trade or commerce."

112.    MB Financial engaged in unfair or deceptive acts or practices or otherwise violated ICFA by, *inter alia*, knowingly and intentionally employing an unfair and deceptive policy and practice of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance, and misrepresenting and failing to disclose its policy and practice of charging overdraft fees on transactions that were approved and authorized into a sufficient available balance.

113.    MB Financial also engaged in unfair, unlawful conduct, made affirmative misrepresentations, or otherwise violated ICFA by, *inter alia*, abusing its discretion to interpret undefined terms in a manner harmful to consumers and benefit to MB Financial.

114.    In addition, MB Financial engaged in unfair or deceptive acts or practices or otherwise violated ICFA by, *inter alia*, by programming its "matrix" to maximize overdraft fee revenue at all costs, and to repeatedly authorize transactions that result in thousands of dollars of overdraft fees each year, despite its representation to consumers that it would exercise discretion in determining when to charge OD Fees. MB Financial also failed to disclose to consumers that they could be subject to thousands of dollars in OD Fees and CDO Fees annually.

115.    Moreover, MB Financial engaged in unfair or deceptive acts or practices or otherwise violated ICFA by, *inter alia*, charging CDO Fees on the day after an account is determined to be negative, despite its representation to consumers that it would not do so.

116.    MB Financial intended that Plaintiff and members of the classes rely on the acts of concealment and omissions, so that Plaintiff and the members of the classes would continue to incur OD and CDO Fees.

117.    MB Financial's conduct caused Plaintiff and the members of the classes to suffer ascertainable losses in the form of excessive OD and CDO Fees that, but for MB Financial's unfair and deceptive practices and policies described herein, would not have otherwise been imposed.

118.    Plaintiff and class members are entitled to damages, treble damages, declaratory relief, injunctive relief, and reasonable attorneys' fees, as permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the members of the Class demand a jury trial on all claims so triable and judgment against Defendant as follows:

A.    An order certifying that this action may be maintained as a class action, that Plaintiff be appointed Class Representative and Plaintiff's counsel be appointed Class Counsel;

B.      Declaring that Defendant's OD Fee and CDO Fee policies and practices to be wrongful, unfair, and unconscionable;

C.      Ordering MB Financial Bank to immediately cease the wrongful conduct set forth above and enjoining MB Financial Bank from continuing to charge OD Fees on transactions that do not actually overdraw accounts, enjoining MB Financial Bank from charging excessive OD Fees, and otherwise enjoining MB Financial Bank from conducting business via the unlawful and unfair business acts and practices complained of herein;

D.      Restitution of all OD Fees and CDO Fees paid to MB Financial by Plaintiff and the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E.      Actual and punitive damages in an amount to be determined at trial;

F.      Pre-judgment interest at the maximum rate permitted by applicable law;

G.      Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

H.      Granting such other relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff and all others similarly situated hereby demand trial by jury on all issues in this complaint that are so triable as a matter of right.

Dated:  March 12, 2018          Respectfully submitted,

*/s/ Katrina Carroll*
Katrina Carroll
*kcarroll@litedepalma.com*
Kyle A. Shamberg
*kshamberg@litedepalma.com*
LITE DEPALMA GREENBERG, LLC
211 West Wacker Drive, Suite 500
Chicago, IL 60606
Main: 312.750.1265

Robert Ahdoot (pending *pro hac vice*)
*rahdoot@ahdootwolfson.com*
Theodore W. Maya (pending *pro hac vice*)
*tmaya@ahdootwolfson.com*
AHDOOT & WOLFSON, PC
10728 Lindbrook Drive
Los Angeles, California 90024
Phn: (310) 474-9111; Fax: (310) 474-8585

Jeffrey D. Kaliel (pending *pro hac vice*)
*jkaliel@kalielpllc.com*
Sophia Gold
*sgold@kalielpllc.com*
KALIEL PLLC
1875 Connecticut Ave., NW, 10th Floor
Washington, D.C.  20009
Phn: (202) 350-4783

***Attorneys for Plaintiff***
***and the Putative Class***