# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RHONDA BOONE, on behalf of herself and
all others similarly situated,

              Plaintiff,

      v.

MB FINANCIAL BANK, N.A.,

              Defendant.

Case No. 1:18-cv-1771

Hon. Charles P. Kocoras

---

## MEMORANDUM OF LAW IN SUPPORT OF
## MB FINANCIAL BANK, N.A.'S MOTION TO DISMISS

Lucia Nale
Thomas V. Panoff
Jed W. Glickstein
MAYER BROWN LLP
71 South Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Facsimile: (312) 701-7711
lnale@mayerbrown.com
tpanoff@mayerbrown.com
jglickstein@mayerbrown.com

*Attorneys for MB Financial Bank, N.A.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 1

ARGUMENT.............................................................................................................. 4

I.    There Is No Cause Of Action For Breach Of The Implied Covenant Of Good Faith And Fair Dealing. ................................................................................... 5

II.   Plaintiff Cannot State A Claim For Breach Of Contract. ................................. 5

    A.    MB Is Permitted To Charge OD Fees On The Date It Pays The Transaction. .............................................................................................. 6

    B.    The Contract Permits MB To Charge A CDOF On The Second Consecutive Day Of An Overdraft. ....................................................... 9

    C.    MB Appropriately Exercised Contractual Discretion......................... 11

III.  Plaintiff Cannot State An ICFA Claim. ......................................................... 13

IV.  Dismissal Should Be With Prejudice Because Amendment Would Be Futile. ............... 15

CONCLUSION.......................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*,
 275 F. Supp. 3d 910 (N.D. Ill. 2017) ........................................................................2

*Anderson v. Burton Assocs., Ltd.*,
 218 Ill. App. 3d 261 (1st Dist. 1991) .......................................................................5

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009).....................................................................................................4

*Barille v. Sears Roebuck & Co.*,
 289 Ill. App. 3d 171 (1st Dist. 1997) .....................................................................13

*Bogie v. Rosenberg*,
 705 F.3d 603 (7th Cir. 2013) ...................................................................................15

*Burke v. 401 N. Wabash Venture, LLC*,
 714 F.3d 501 (7th Cir. 2013) ...................................................................................13

*Chico v. Miller*,
 2005 WL 2664586 (N.D. Ill. Oct. 19, 2005)...........................................................15

*Cochran v. Ill. State Toll Highway Auth.*,
 828 F.3d 597 (7th Cir. 2016) .....................................................................................4

*Cohn v. Guaranteed Rate Inc.*,
 130 F. Supp. 3d 1198 (N.D. Ill. 2015) ......................................................................5

*Coleman v. Madison Two Assocs.*,
 307 Ill. App. 3d 570 (1st Dist. 1999) .....................................................................13

*Conrad v Nutramax Labs., Inc.*,
 2013 WL 5288152 (N.D. Ill. Sept. 18, 2013) .........................................................14

*Cont. Cas. Co. v. LaSalle Re Ltd.*,
 511 F. Supp. 2d 943 (N.D. Ill. 2007) ......................................................................11

*Echo, Inc. v. Timberland Mach. & Irr., Inc.*,
 2009 WL 562639 (N.D. Ill. Mar. 5, 2009)................................................................5

*Gallagher v. Lenart*,
 367 Ill. App. 3d 293 (1st Dist. 2006) .......................................................................6

**Page(s)**

*Illinois ex rel. Hammer v. Twin Rivers Ins. Co.*,
2017 WL 2880899 (N.D. Ill. July 5, 2016)................................................5

*Hill v. St. Paul Fed. Bank for Sav.*,
329 Ill. App. 3d 705 (1st Dist. 2002) ....................................................15

*Krause v. GE Capital Mort. Serv., Inc.*,
314 Ill. App. 3d 376 (1st Dist. 2000) ....................................................15

*LaSalle Bank N.A. v. Paramont Properties*,
588 F. Supp. 2d 840 (N.D. Ill. 2008) ......................................................5

*Lewitton v. ITA Software, Inc.*,
585 F.3d 377 (7th Cir. 2009) ...................................................................6

*McArdle v. Peoria Sch. Dist. No. 150*,
705 F.3d 751 (7th Cir. 2013) ...................................................................5

*Moore v. MB Fin. Bank, N.A.*,
280 F. Supp. 3d 1069 (N.D. Ill. 2017) ..............................................1, 2, 4

*Quake Construction v. American Airlines*,
141 Ill. 2d 281 (1990) ...........................................................................5, 6

*Resolution Trust Corp. v. Holtzman*,
248 Ill. App. 3d 105 (1st Dist. 1993) ....................................................13

*Roberts v. Capital One, N.A.*,
2017 WL 1750445 (S.D.N.Y. May 4, 2017) ...........................................9

*Roberts v. Capital One, N.A.*,
719 F. App'x 33 (2d Cir. 2017) ...............................................................9

*Rosenblum v. Travelbyus.com Ltd.*,
299 F.3d 657 (7th Cir. 2002) ...................................................................2

*Saunders v. Michigan Ave. Nat'l Bank*,
278 Ill. App. 3d 307 (1996) ................................................12, 13, 14, 15

*Voyles v. Sandia Mortgage Corp.*,
196 Ill. 2d 288 (2001) ..........................................................................5, 12

*Wilson v. Career Educ. Corp.*,
729 F.3d 665 (7th Cir. 2013) ...................................................................5

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**Statutes, Rules and Regulations**

Fed. R. App. P. 26(A)(1)(A) ...........................................................................................................10

**Other Authorities**

Merriam-Webster, Definition of "Consecutive," https://www.merriam-
    webster.com/dictionary/consecutive (last visited July 5, 2018) .............................................10

# INTRODUCTION

Plaintiff Rhonda Boone ("Plaintiff") brings a three-count putative class action complaint against Defendant MB Financial Bank, N.A. ("MB") based on overdraft fees that MB allegedly charged her in connection with her checking account in 2015, 2016, and 2017. These claims will strike a familiar chord. Just eight months ago, this Court dismissed with prejudice similar claims—brought on behalf of a different plaintiff by the same Plaintiff's counsel—that MB's assessment of overdraft fees allegedly violated the usury provisions of the National Bank Act. *See Moore v. MB Fin. Bank, N.A.*, 280 F. Supp. 3d 1069 (N.D. Ill. 2017).[1] As explained below, the claims in the instant case fare no better than the ones the Court dismissed in *Moore*. They are based on flawed interpretations of clear contractual language. Plaintiff asks the Court to ignore existing contract provisions and instead read into the parties' agreement provisions that do not exist. Plaintiff's claims accordingly should be dismissed in their entirety and with prejudice.

# BACKGROUND

Plaintiff, an MB checking account customer, alleges that from 2015 onward MB has assessed her overdraft fees in purported violation of its checking account agreement and Illinois law. Dkt. 1 ("Compl."), ¶ 1-2. Plaintiff attaches two documents as exhibits to her Complaint in support of her claims. *Id*. ¶ 23. One document is a description of overdraft options from MB's website. Dkt. 18 (Ex. 1) ("Overdraft Page").[2] The other document, titled Personal Banking Customer Fee Schedule, lists the various fees applicable to MB checking accounts. Dkt. 18-1 (Ex. 2) ("Fee Schedule"). The Fee Schedule, in turn, lists two other documents that comprise "the agreement that governs your MB deposit account." *Id*. at 1. These documents, called Our

---

[1]    The appeal in the *Moore* case is pending before the Seventh Circuit (No. 17-3546). Plaintiff's counsel, Jeffrey Kaliel, withdrew as attorney for the plaintiff in *Moore* in March 2018, approximately two weeks after Plaintiff filed this case. *See Moore v. MB Fin. Bank, N.A.*, No. 1:17-cv-4716, Dkt. 47.

[2]    This exhibit is also available at Overdraft Protection, https://www.mbfinancial.com/personal/ checking/Overdraft-Options (last visited July 11, 2018).

Relationship Account Disclosure ("Account Disclosure") and Truth in Savings Disclosure ("Savings Disclosure"), are attached to this memorandum as Exhibits A and B, respectively. When she opened her account, Plaintiff signed a signature card (attached as Exhibit C), acknowledging receipt of these documents and consenting to their terms.[3]

There are two particular fees at issue in Plaintiff's Complaint. The first is a $37 charge called an "Overdraft Fee" or "OD Fee." The OD Fee is assessed whenever the bank pays a customer's checking account transaction despite a lack of funds in the account to cover the transaction. Compl. ¶ 4. The second fee is a $6.50 daily charge called the "Continuous Daily Overdraft Fee" or "CDOF"—the same fee at issue in *Moore*. *See* 280 F. Supp. 3d at 1070. The CDOF is assessed beginning on the second calendar day that an account has a negative balance of more than $10, continuing up to fifteen more days. Compl. ¶¶ 4, 53. A customer can avoid both of these fees, in the first case by not authorizing transactions with the potential to bring her account balance negative or by adding sufficient funds to her account prior to the time such transactions post, and in the second, by bringing her account into a positive balance.

Plaintiff challenges three aspects of MB's overdraft fees. The first is MB's assessment of OD Fees on certain debit-card related transactions. Plaintiff alleges that when a customer makes a purchase using a debit card, MB tentatively approves the transaction and purportedly "sequesters" an amount of funds from the customer's account to cover the transaction while it remains pending. *Id*. ¶¶ 16, 19. If on the date that the transaction settles the customer's account has a negative balance due to intervening charges that settle sooner than the challenged

---

[3] Plaintiff did not submit the Account Disclosure, Savings Disclosure, or signature card with her Complaint. However, because these documents reference and incorporate each other and form part of the same instrument, they are appropriate to consider at this stage. When a complaint "attaches only part of a relevant document," a court can "consider the entire document if the defendant appends it" to its motion to dismiss. *In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig.*, 275 F. Supp. 3d 910, 914 (N.D. Ill. 2017); *see also Rosenblum v. Travelbyus.com Ltd.*, 299 F.3d 657, 661-62 (7th Cir. 2002) (court could consider the entire contract where plaintiff "appended only part of the relevant instrument").

transaction, MB charges an OD Fee on the challenged transaction. Plaintiff terms these kinds of transactions "Authorize Positive, Purportedly Settle Negative" (or "APPSN") "Transactions." *Id.* ¶ 16. She claims that because MB supposedly "sequesters" funds in the checking account at the time of purchase for the debit card transactions, assessing an OD Fee on APPSN Transactions violates the terms of MB's contract. *Id.* ¶¶ 13-40.

The second practice that Plaintiff challenges concerns the bank's assessment of the CDOF. Under the terms of the parties' contract, a CDOF "is charged beginning on the second consecutive calendar day the account is negative by more than $10." *Id.* ¶ 54. Plaintiff claims that this language does not authorize MB to assess a CDOF "until *two full calendar days after the day an account goes negative*." *Id.* ¶ 55. Thus, if an account goes into an overdrawn status at some point on a Monday, Plaintiff claims that MB must wait until *Wednesday*—two days after the day of the overdraft—to assess a CDOF, and supposedly cannot count the negative status on Monday and begin assessing a CDOF on Tuesday. *Id.* ¶¶ 56-61.

The third and final overdraft practice that Plaintiff challenges is MB's discretion over whether to pay an overdraft transaction. MB's account documents provide that MB "does not guarantee that your overdraft transaction will be paid." *Id.* ¶ 67. If MB decides to pay the overdraft transaction, the transaction will clear and the customer is charged the OD Fee. *Id.* But if MB declines to pay an overdraft transaction, the bank returns the transaction and assesses the customer a Returned Item Fee. *Id.* Plaintiff does not dispute that MB may pay overdrafts and collect appropriate fees pursuant to these provisions. But, she contends, MB has abused this discretion by somehow paying *too many* of her overdrafts, allegedly in order to maximize its profits. *Id.* ¶¶ 68-73. Plaintiff does not explain what number of overdrafts is too many, but appears to believe the fees assessed are too high as a percentage of her net income. *See id.* ¶ 2.

Based on these three theories of liability, Plaintiff brings three causes of action (captioned "claims for relief" in the Complaint). The first cause of action is for alleged breach of contract, and is based only on Plaintiff's APPSN and CDOF theories. *Id*. ¶¶ 85-93. The second, for alleged breach of the implied covenant of good faith and fair dealing, is based on all three theories (APPSN, CDOF, and discretion whether to pay overdrafts). *Id*. ¶¶ 94-105. And the third, for alleged violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. ("ICFA"), is based on all three theories as well. *Id*. ¶¶ 106-118.

As explained below, Plaintiff's theories are factually and legally meritless because they reflect practices that are authorized by the express language of the relevant account documents, which Plaintiff agreed to when she opened her account. Plaintiff gives no justification to depart from the plain language of the these documents, which she operated under for years without incident, and which must be enforced as written. Because the parties' contract unambiguously permits all of the practices Plaintiff challenges, Plaintiff's claims should be dismissed with prejudice, just like those in *Moore*.

## ARGUMENT

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts that "plausibly suggest that the plaintiff has a right to relief." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599-600 (7th Cir. 2016). The Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-moving party, *id*., but "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## I. There Is No Cause Of Action For Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

As an initial matter, the Court should dismiss Plaintiff's second cause of action for breach of the implied covenant of good faith and fair dealing because there is no such cause of action in Illinois. The covenant is "only an aid for contract interpretation," and not "an independent source of contractual duties or liability itself." *Cohn v. Guaranteed Rate Inc.*, 130 F. Supp. 3d 1198, 1210 (N.D. Ill. 2015). In *Voyles v. Sandia Mortgage Corp.*, 196 Ill. 2d 288 (2001), the Illinois Supreme Court held that the implied covenant of good faith is not an independent cause of action except "in the narrow context of cases involving an insurer's obligation to settle with a third party who has sued the policy holder." *Id.* at 296. After *Voyles*, federal courts, including this Court, have not hesitated to dismiss standalone claims for breach of the implied covenant under Illinois law. *See, e.g.*, *McArdle v. Peoria Sch. Dist. No. 150*, 705 F.3d 751, 755 (7th Cir. 2013); *Wilson v. Career Educ. Corp.,* 729 F.3d 665, 674 (7th Cir. 2013); *Echo, Inc. v. Timberland Mach. & Irr., Inc.*, 2009 WL 562639, at *3 (N.D. Ill. Mar. 5, 2009); *LaSalle Bank N.A. v. Paramont Properties*, 588 F. Supp. 2d 840, 853 (N.D. Ill. 2008). Because Illinois does not recognize an independent cause of action for breach of the implied covenant, Plaintiff's second cause of action should be dismissed as a matter of law.[4]

## II. Plaintiff Cannot State A Claim For Breach Of Contract.

Under Illinois law, the first question in interpreting a contract is "whether the language … is ambiguous as to the parties' intent." *Quake Construction v. American Airlines*, 141 Ill. 2d

---

[4] Even if the Court were to reach the merits of the second cause of action, the Court should dismiss the claim for all of the reasons stated in Part II *infra*. In addition, the Court should dismiss the claim as it pertains to Plaintiff's OD Fee and CDOF timing theories, which do not turn on any exercise of discretion by the bank and accordingly do not implicate the implied covenant in the first place. *See, e.g.*, *Illinois ex rel. Hammer v. Twin Rivers Ins. Co.*, 2017 WL 2880899, at *6 (N.D. Ill. July 5, 2016) ("Without any express provision that vested Defendant with discretion, there is no underlying contract language that the implied covenant can be tethered to or used to interpret."); *Anderson v. Burton Assocs., Ltd.*, 218 Ill. App. 3d 261, 267 (1st Dist. 1991) (same).

281, 288 (1990). If the language is not objectively ambiguous, the parties' intent must be derived "solely from the writing itself," *id.*, and a court must enforce the contract "as written." *Lewitton v. ITA Software, Inc.*, 585 F.3d 377, 380 (7th Cir. 2009). A court "cannot alter, change or modify the existing terms of a contract or add new terms or conditions to which the parties do not appear to have assented, write into the contract something which the parties have omitted or take away something which the parties have included." *Gallagher v. Lenart*, 367 Ill. App. 3d 293, 301 (1st Dist. 2006), *aff'd*, 226 Ill.2d 208 (2007).

Plaintiff's flawed interpretations of the relevant documents flout this basic principle. Plaintiff argues that MB breached the terms of the account documents in two respects: by charging an OD Fee on the settlement date although the funds from a debit card transaction allegedly had been tentatively "sequestered" at the time of the transaction; and by charging a CDOF less than two full days after the first day on which the account went into overdraft. Compl. ¶¶ 89, 91. Both practices are clearly permitted by the governing account documents. Plaintiff also argues—albeit not in connection with her contract cause of action—that MB improperly exercised its discretion to approve or deny overdrafts. *Id.* ¶ 103. This claim, too, ignores the express terms of the documents Plaintiff cites. Accordingly, as a matter of law, the Court should dismiss the contract cause of action in its entirety.

### A. MB Is Permitted To Charge OD Fees On The Date It Pays The Transaction.

As noted above, Plaintiff's first theory is based on what she terms "Authorize Positive, Purportedly Settle Negative Transactions." Compl. ¶ 16. When a customer uses a debit card to purchase goods or services from a merchant, MB allegedly puts a tentative "debit hold" on the account, reducing the account's available balance. *Id.* ¶¶ 17-18. The funds are unavailable for other transactions until the transaction is presented for settlement, which may not occur until several days after the transaction date, depending on the merchant's practices and timing (*e.g.*, a

gas station might keep the charge as pending longer than a grocery store). *Id.* Plaintiff alleges that MB improperly assesses OD Fees on APPSN transactions. Specifically, Plaintiff alleges that if a customer makes additional purchases in the period between the date the debit hold is initiated and the date of settlement, and those additional purchases push the account into a negative balance, MB violates its contract if it assesses an OD Fee when the "sequestered" debit card transaction finally settles.[5]

An example will make this clear. Suppose on Day 1 a customer has $100 in her account. She uses a debit card to purchase $50 of gas, resulting in a $50 hold and a $50 available balance. On Day 2, the customer writes a check to purchase $75 of groceries. On Day 3, the check is presented for payment and the bank pays it, causing the available balance in the account to go negative and incur a $37 OD Fee. Finally, on Day 4, the initial $50 debit card transaction settles. Because the balance in the account is negative due to the intervening $75 check and OD Fee, there is not enough in the account to cover the $50 debit card transaction. If MB decides to pay the debit card transaction notwithstanding the lack of funds, it thus assesses another $37 OD Fee. Plaintiff does not challenge the $37 OD Fee related to the check to the grocery store, but contends that MB cannot assess the $37 OD Fee related to the gas because the funds to cover the purchase were purportedly "sequestered" from the account on Day 1. Compl. ¶¶ 29-30.

The problem with Plaintiff's theory is that it is not supported by any contractual language. Plaintiff invokes the following language from the Overdraft Page:

> An overdraft occurs when you do not have enough money available in your account to cover a transaction, but we pay it anyway.

> Our standard overdraft practice comes with your account and allows us to use our discretion when paying items that will overdraw your account.

---

[5] Plaintiff challenges only the OD Fee for the "sequestered" transaction, not the OD Fee assessed for the intervening transactions that make the account negative in the first place. Compl. ¶ 22.

> ATM or everyday debit card transactions that overdraw your account may be declined, unless you sign up for Guard My Card, a service that, at our discretion, pays these types of transactions (overdraft related fees apply). If your transaction is declined, no fee is charged.
>
> * * *
>
> Insufficient Funds and Overdraft Related Fees Overdraft Fee …$37 per item…To determine your available balance, subtract (1) deposits that are not yet available for withdrawal under our Funds Availability Policy, (2) debit card or other transactions that we are legally obligated to pay or have already paid out in cash, (3) other pending transactions such as ACH transactions, and (4) any holds on your balance, such as holds on funds to comply with court orders or other legal requirements.

Compl. ¶ 23 (ellipses in original). Plaintiff claims that assessing an OD Fee on an APPSN Transaction is inconsistent with these representations because MB supposedly agreed that to charge OD Fees only "on transactions with insufficient available funds to pay a given transaction and that the bank will immediately deduct or place a hold on funds for such transactions." *Id*. ¶ 27. But that is exactly what happens when an APPSN transaction is presented for settlement. On the date that MB pays the transaction—the *settlement* date—there are "insufficient available funds" because the customer, in the interim, has chosen to make additional, intervening payments from her account that caused it to have a negative balance. Thus, even assuming that the Overdraft Page had contractual force, Plaintiff's argument fails as a matter of law.

Plaintiff also claims that assessing OD Fees for APPSN Transactions violates a supposed promise "to make overdraft determinations only at the time it elects whether or not to pay an overdraft." *Id*. ¶ 38. There is no such language in the contract. The Overdraft Page clearly states that an overdraft occurs when the bank *pays* a transaction. *See id*. ¶ 23 ("An overdraft occurs when you do not have enough money available in your account to cover a transaction, but we pay it anyway."). The Account Disclosure[6] likewise states that "[i]f an item is presented without

---

[6] Citations to the Account Disclosure use the pinpoint page numbers at the bottom of each column of text. Emphasis is added throughout.

sufficient funds in your account to pay it, we may, at our discretion, *pay the item* (*creating* an overdraft).” Ex. A at 11; *see also id.* at 5 (“[i]f we pay the check or debit, you agree to repay the overdraft immediately”). None of the applicable documents state that an overdraft is created when MB “*decides* to pay” or “*elects* to pay a transaction.”[7]

Plaintiff’s reference to a “must-pay” network rule, which requires MB to pay debit-card transactions that it has previously authorized, is beside the point and misconstrues that “rule.” *Id.* ¶ 38. That MB agrees to *authorize* a debit card transaction at the time the customer swipes her debit card means only that MB must pay the merchant for the transaction *when* the transaction is eventually presented for settlement. *Id.* It does not mean that MB *pays* the merchant at the time of authorization, or that MB has waived its contractual right to collect overdraft fees from the *customer* if, at the time of payment, there are insufficient funds in the customer’s account.

## B. The Contract Permits MB To Charge A CDOF On The Second Consecutive Day Of An Overdraft.

Plaintiff’s CDOF argument similarly misconstrues the applicable contractual language. MB’s Fee Schedule expressly states that MB may charge a CDOF “beginning on the second *consecutive calendar day* the account is negative by more than $10.” Compl. ¶ 54. The agreement does not refer to “the second consecutive calendar day *not including the first day* the

---

[7] The absence of “elect to pay” language in MB’s account agreement distinguishes this case from *Roberts v. Capital One, N.A.*, 719 F. App’x 33 (2d Cir. 2017). In *Roberts*, the bank’s contract provided that the bank may “in [its] sole discretion, and without obligation, elect to pay checks and other items drawn on your deposit account … for an amount in excess of your available balance (an ‘Overdraft’).” The court held that the “elect to pay” language sufficed to state a claim based on an APPSN theory because it left ambiguous whether an overdraft occurred when the bank paid or when it authorized the transaction. *Id.* at 35-36. MB’s agreement, by contrast, has no such ambiguity: an overdraft is “*creat*[*ed*]” when the bank “*pay*[*s*] the item.” Ex. A at 11. For this reason, the district court’s conclusion in *Roberts* is fully applicable here: “the occurrence of an overdraft is the triggering event for assessing overdraft fees, and the Account Agreements expressly provide that an overdraft occurs when Defendant *pays*—and not merely authorizes—a transaction in an amount that exceeds a customer’s available balance.” *Roberts v. Capital One, N.A.*, 2017 WL 1750445, at *3 (S.D.N.Y. May 4, 2017) (emphasis in original).

account is negative" or even "the second consecutive calendar day *after* the account is negative." Plaintiff argues that the Court should read such language into the contract, but she is wrong.

The analysis of the relevant provision is straightforward. The word "consecutive" means "following one after the other in order."[8] If an account goes into overdraft status on Day 1 and remains in overdraft status on Day 2, then Day 2 is the "second consecutive day" that the account is negative, because Day 2 follows in order after the first negative-balance day (Day 1). Thus, MB is permitted to assess a CDOF beginning on Day 2.

Plaintiff's various attempts to avoid this conclusion are unavailing. She first argues that "[i]n our legal system and in our culture more broadly, counting begins on the day *after* a triggering event." Compl. ¶ 55. As just shown, this contention is contrary to the plain meaning of the words in the contract. The only authority Plaintiff cites in support of this broad "cultural" meaning, moreover, is Federal Rule of Appellate Procedure 26, which states that in computing time under any *rule*, *local rule*, *or court order* that does not specify a method for computing time, the period excludes the day of the triggering event. *Id*. (citing Fed. R. App. P. 26(A)(1)(A)). This provision is inapposite by its own terms. MB's private contract with Plaintiff is not a court rule or court order. The Fee Schedule language is clear and there is no need to resort to outside sources of interpretation, let alone to the Federal Rules of Appellate Procedure.

Plaintiff also argues that because MB allegedly calculates its ledger balance after the end of the business day, the "first full business day that an account may be in a negative status" is the day after the ledger balance is calculated. Compl. ¶ 57. Even if true, that is irrelevant. The Fee Schedule does not refer to "full business days." It refers to "consecutive calendar days." Plaintiff again asks the Court to read into the contract language that is not there.

---

[8] Merriam-Webster, Definition of "Consecutive," https://www.merriam-webster.com/dictionary/consecutive (last visited July 5, 2018).

Finally, Plaintiff argues that MB should begin counting the day after the overdraft because: (1) MB does not determine initial overdrafts until the end of the business day and (2) assesses OD Fees the day after the overdraft transaction is posted. *Id.* ¶¶ 59, 61. These observations are again irrelevant. The Fee Schedule does not refer to the time of day that the bank determines whether there is an overdraft. Nor does it refer to the date on which an OD Fee is deducted from the account. It refers instead solely to the negative *status* of the account: the "second consecutive calendar day the account is negative." And the Court must enforce the contract as written, not as Plaintiff would like it to be written. *See Cont. Cas. Co. v. LaSalle Re Ltd.*, 511 F. Supp. 2d 943, 947 (N.D. Ill. 2007).

### C.    MB Appropriately Exercised Contractual Discretion

In addition to the two theories discussed above, Plaintiff alleges that MB "abused its discretion" by paying overdraft transactions authorized by Plaintiff. Compl. ¶¶ 64-73. Though not expressly part of her breach of contract claim, Plaintiff's invocation of this theory in support of her implied covenant of good faith claim implies that she believes this practice constitutes a breach of contract as well. MB therefore addresses that theory here.

The Overdraft Page states that MB "do[es] not guarantee that your overdraft transaction will be paid" and that "ATM or everyday debit card transactions that overdraw your account may be declined, unless you sign up for Guard My Card, a service that, at our discretion, pays these types of transactions." *Id.* ¶ 67. However, the contract also provides that "[i]f the item is paid, you will be charged an Overdraft Fee." *Id.* Once again, the contractual terms in the Account Disclosure are in accord. The Account Disclosure states that "[i]f we pay the check or debit, you agree to repay the overdraft immediately," and also that "you agree that we may charge to and debit from your account an overdraft/insufficient available funds fee as provided in our fee schedule." Ex. A at 5. Consistent with the Overdraft Page, the Account Disclosure further states

that "[w]e are under no obligation to permit overdrafts." *Id*. This language makes clear that the bank will assess customers an OD Fee if the bank pays an overdraft item, but that there may be circumstances in which the bank chooses not to pay.

The fact that MB will not guarantee overdraft payments is important information for a customer who intends to use their account to pay for things like rent, food, medicine, or transportation. But these provisions do not create an independent obligation for the bank to exercise its discretion in a particular way. They merely inform customers—accurately—that the customers cannot assume that MB will approve all overdraft transactions.

Plaintiff tries to transform these disclosures into a paternalistic promise to monitor customers' account activity and deny overdraft transactions when, in the bank's view, such transactions are not in the customer's long-term benefit. Plaintiff even suggests that the bank has some kind of obligation to assess the amount of OD Fees it charges against the customer's disposable income. Compl. ¶ 2. There is no such promise or obligation—nor would it be commercially practicable. The written provisions merely state that MB may or may not pay overdraft transactions, and explains what will happen in either circumstance.

In fact, Illinois courts have squarely rejected plaintiff's theory that a bank violates an implied covenant by assessing overdraft fees in accordance with written policy, regardless of the bank's discretion to deny an overdraft. In *Saunders v. Michigan Ave. Nat'l Bank*, 278 Ill. App. 3d 307 (1996), the plaintiff sued the bank for honoring a check despite insufficient balance and assessing the plaintiff a $20 overdraft fee as well subsequent overdraft fees. *Id*. at 309-10. The plaintiff argued that the bank's conduct breached the implied duty of good faith and fair dealing, and focused in particular on the bank's "sole discretion in determining whether to assess the

[overdraft] charge." *Id*. at 315.[9] The court rejected this argument because "the contract clearly and unambiguously provides that the Bank will charge $20 per day for overdrafts" and "[w]hen the terms of a contract are clear and unambiguous, they must be enforced as written and no court can rewrite a contract to provide a better bargain to suit one of the parties." *Id*. at 316. In words equally applicable to this case, the court stated that the plaintiff's "awareness of the Bank's right to charge the overdraft fee negates any inference that the Bank's actions were so far outside the parties' reasonable expectations as to constitute a breach of good faith." *Id*.

MB likewise exercised its right to approve overdraft transactions and assess OD Fees in accordance with the express terms of its contract. Having agreed that MB could "charge to and debit from [her] account an overdraft/insufficient available funds fee as provided in [the] fee schedule" when it paid an overdraft (Ex. A at 5), Plaintiff cannot now argue that MB's decision to do so violated an implied covenant. It is black letter law that "an implied covenant of good faith cannot override or modify the express terms of [a] contract." *Coleman v. Madison Two Assocs.*, 307 Ill. App. 3d 570, 578 (1st Dist. 1999); *see also Burke v. 401 N. Wabash Venture, LLC*, 714 F.3d 501, 508 (7th Cir. 2013) (rejecting the argument that the implied covenant "overrides" contract provisions). Put another way, Illinois law is clear that "[p]arties are entitled to enforce the terms of negotiated contracts to the letter without being mulcted for lack of good faith." *Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 176 (1st Dist. 1997) (citing *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 113 (1st Dist. 1993)).

## III.    Plaintiff Cannot State An ICFA Claim.

Plaintiff's cause of action under the ICFA fails for many of the same reasons as her contract cause of action. The ICFA claim is based on all three alleged theories of wrongdoing:

---

[9]    *Saunders* was decided before the Illinois Supreme Court clarified in *Voyles v. Sandia Mortgage Corp.* that there is no standalone cause of action for breach of the implied covenant. *See supra* Part I.

the APPSN theory, the CDOF timing theory, and the discretion-to-pay theory. To state a claim under the ICFA, a plaintiff must allege facts plausibly showing (1) a deceptive act or unfair practice; (2) the defendant's intent that the plaintiff rely on the deception; (3) that the deception occurred during trade or commerce; (4) actual damages; and (5) proximate cause. *Conrad v Nutramax Labs., Inc.*, 2013 WL 5288152, at *2 (N.D. Ill. Sept. 18, 2013).

Plaintiff's ICFA claim falters at the first step because, as explained above, all of the conduct she complains of was expressly authorized by the contracts and disclosures provided to her. *See supra* Part II. Plaintiff knowingly accepted those terms and decided to continue to authorize transactions for many years as a MB customer knowing that, if accepted, the transactions would incur applicable overdraft fees. As such, MB's decision to assess OD Fees and/or a CDOF under the terms of the parties' agreement cannot be deceptive or unfair.

*Saunders* again is squarely on point. The plaintiff in that case brought an ICFA claim, alleging that the bank's assessment of overdraft fees was both deceptive and unfair. As the court explained, the ICFA claim failed because the Bank had "provid[ed]" the plaintiff "with pamphlets which expressly stated that it would charge $20 per day for overdrafts" and the plaintiff "accepted the unambiguous fee terms by opening her account"; accordingly, there was "no element of deception between the parties." 278 Ill. App. 3d at 313. Here, too, MB's account documents and disclosures accurately set forth all of the applicable terms governing overdrafts. Plaintiff accepted those terms by opening her account and continued to use her account in the ordinary course for years. She therefore has no claim under ICFA.

The *Saunders* court also rejected Plaintiff's theory based on the bank's exercise of discretion to pay or deny overdraft transactions. As the court explained, the plaintiff "not only had control over whether she would be assessed an overdraft fee, but was free to select another

Bank" if she did not like the overdraft terms that were offered. *Id.* at 314. The bank provided the plaintiff with "all of the information necessary to make a meaningful choice in selecting banks." *Id.* Thus, as here, the court found that "the Bank's overdraft policy fails to rise to the level of unfairness necessary to support a claim under the Consumer Fraud Act." *Id.*

Similarly, in *Hill v. St. Paul Federal Bank for Savings*, 329 Ill. App. 3d 705 (1st Dist. 2002), the Illinois Appellate Court dismissed an ICFA claim based on the bank's alleged failure to disclose the posting order of overdraft fees, because nothing in the account agreements was misleading and customers could "inquire if they desired information about the order in which checks were posted." *Id.* at 713-14. And in *Krause v. GE Capital Mortgage Services, Inc.*, 314 Ill. App. 3d 376 (1st Dist. 2000), the court dismissed an ICFA claim based on quote and fax fees that were disclosed prior to plaintiff choosing and being charged for the services. *Id.* at 388. These authorities dispose of Plaintiff's ICFA claim as well.

## IV. Dismissal Should Be With Prejudice Because Amendment Would Be Futile.

Plaintiff cannot allege any additional facts to alter the language of her contract with MB. Nor can she change the fact that the relevant documents authorize and disclose all of the overdraft practices she identifies, thus defeating any contention that MB breached the contract or engaged in unfair or deceptive practices under ICFA as a matter of law. Because further amendment would be futile, this Court should dismiss the Complaint with prejudice. *See, e.g.*, *Bogie v. Rosenberg*, 705 F.3d 603, 616 (7th Cir. 2013) (affirming dismissal with prejudice where claim "fails as a matter of law" and "[l]eave to amend could not avoid" the problem); *Chico v. Miller*, 2005 WL 2664586, at *6 (N.D. Ill. Oct. 19, 2005) (same).

## CONCLUSION

For the foregoing reasons, the Court should dismiss the entire Complaint with prejudice.

Date: July 13, 2018                          Respectfully submitted,


                                             /s/ Thomas V. Panoff
                                             Lucia Nale
                                             Thomas V. Panoff
                                             Jed W. Glickstein
                                             MAYER BROWN LLP
                                             71 South Wacker Drive
                                             Chicago, IL 60606
                                             Telephone: (312) 782-0600
                                             Facsimile: (312) 701-7711

                                             *Attorneys for MB Financial Bank, N.A.*

**CERTIFICATE OF SERVICE**

The undersigned attorney hereby certifies that a true and correct copy of the foregoing was served upon all parties of record via the Electronic Filing System of the U.S. District Court for the Northern District of Illinois on July 13, 2018.

*/s/ Thomas V. Panoff*
Thomas V. Panoff

Exhibit A

# mb financial
bank

## Our Relationship

### Account Disclosure Information

- Terms and Conditions
- Electronic Transfers
- Funds Availability

## TABLE OF CONTENTS

TERMS AND CONDITIONS ...................................................................2
Important Information About Procedures for
   Opening a New Account ..............................................................2
Agreement ...........................................................................................2
Liability ................................................................................................3
Deposits ..............................................................................................4
Withdrawals .........................................................................................4
Ownership of Account and Beneficiary Designation ............................6
Business, Organization and Association Accounts ...............................7
Stop Payments .....................................................................................7
Transfer Limitations .............................................................................8
Amendments and Termination ..............................................................8
Statements ..........................................................................................8
Account Transfer ..................................................................................9
Setoff .................................................................................................10
Convenience Depositor ......................................................................10
Authorized Signer ..............................................................................10
Restrictive Legends ...........................................................................11
Payment Order of Items .....................................................................11
Check Processing ..............................................................................11
Check Cashing ...................................................................................11
Death or Incompetence .....................................................................11
Early Withdrawal Penalties .................................................................11
Waiver of Notices ..............................................................................12
ACH and Wire Transfers .....................................................................12
Facsimile Signatures ..........................................................................12
Stale-Dated Checks ...........................................................................12
FDIC Insurance ..................................................................................12
Indorsements .....................................................................................12
UTMA Accounts .................................................................................13
Fiduciary Accounts ............................................................................13
Cash Transaction Reporting ...............................................................13
Backup Withholding/TIN Certification .................................................13
Credit Verification ..............................................................................14
Lost, Destroyed, or Stolen Certified, Cashier's
   or Teller's Checks ......................................................................14
Transactions by Mail ..........................................................................14
Legal Actions Affecting Your Account .................................................15
Check Storage and Copies .................................................................15
Truncation, Substitute Checks, and Other Check Images ...................15
Security .............................................................................................15
Unlawful Internet Gambling Notice .....................................................16
Monitoring and Recording Telephone Calls .........................................16
Telephonic Instructions ......................................................................16
Claim of Loss .....................................................................................16
Address or Name Changes .................................................................16
Resolving Account Disputes ...............................................................16
Release of Account Information ..........................................................16
Chargebacks ......................................................................................17
NOW and Demand Deposit Account Organization ...............................17
Funds Transfers .................................................................................17
ELECTRONIC FUND TRANSFERS .....................................................19
FUNDS AVAILABILITY DISCLOSURE .................................................25

## TERMS AND CONDITIONS
## OF YOUR ACCOUNT

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT -** To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth (for individuals), and other information that will allow us to identify you. We may also ask to see your driver's license (for individuals) or other identifying documents.

**AGREEMENT (for Illinois) -** This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this document. If you have any questions, please call us.

This agreement is subject to applicable federal laws, the laws of the state of Illinois and other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

(1) summarize some laws that apply to common transactions;
(2) establish rules to cover transactions or events which the law does not regulate;
(3) establish rules for certain transactions or events which the law regulates but permits variation by agreement; and
(4) give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document.

As used in this document the words "we," "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

**AGREEMENT (for Indiana) -** This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this document. If you have any questions, please call us.

This agreement is subject to applicable federal laws, the laws of the state of Indiana and other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

(1) summarize some laws that apply to common transactions;
(2) establish rules to cover transactions or events which the law does not regulate;
(3) establish rules for certain transactions or events which the law regulates but permits variation by agreement; and
(4) give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document.

As used in this document the words "we," "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

**AGREEMENT (for Pennsylvania) -** This document, along with any other documents we give you pertaining to your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees if they are not included in this document. If you have any questions, please call us.

This agreement is subject to applicable federal laws, the laws of the state of Pennsylvania and other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. Any provision that appoints us as an agent is not subject to the provisions of 20 Pa.C.S.A. Section 5601 et seq. (Chapter 56; Decedents, Estates and Fiduciaries Code). By exercising any of our rights under this agreement, we do so for our sole benefit. The purpose of this document is to:

(1) summarize some laws that apply to common transactions;
(2) establish rules to cover transactions or events which the law does not regulate;
(3) establish rules for certain transactions or events which the law regulates but permits variation by agreement; and
(4) give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document.

As used in this document the words "we," "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular.

**LIABILITY -** You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without

notice to you, directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement.

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and can be deducted directly from the account balance whenever sufficient funds are available. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you.

**DEPOSITS -** We will give only provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Before settlement of any item becomes final, we act only as your agent, regardless of the form of indorsement or lack of indorsement on the item and even though we provide you provisional credit for the item. We may reverse any provisional credit for items that are lost, stolen, or returned. Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open. At our option, we may take an item for collection rather than for deposit. If we accept a third-party check for deposit or check cashing, we may require any third-party indorsers to verify or guarantee their indorsements, or indorse in our presence with proper identification.

We may accept, except for collection only, refuse, or return all or part of any deposit. If we accept checks or other items for deposit to your account or cash them, you are responsible for the checks and other items if there is a subsequent problem with them. If we cash a check or other item for you or credit it to your account and it is not paid for any reason, we may charge your account for the amount of the check or other item, even if this causes your account to be overdrawn. We may refuse to deposit for deposit to your account items payable to another person.

**WITHDRAWALS -**

**Generally -** Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs to open the account or has authority to make withdrawals may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person who signs or has authority to make withdrawals to indorse any item payable to you or your order for deposit to this account or any other transaction with us.

**Postdated checks -** A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act. Because we process checks mechanically, your notice will not be effective and we will not be liable for failing to honor your notice unless it precisely identifies the number, date, amount and payee of the item.

**Checks and withdrawal rules -** If you do not purchase your check blanks from us, you must be certain that we approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to

apply the frequency limitations. In addition, we may place limitations on the account until your identity is verified.

Even if we honor a nonconforming request, we are not required to do so later. If you violate the stated transaction limitations (if any), in our discretion we may close your account or reclassify it as a transaction account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification.

If we are presented with an item drawn against your account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item.

See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal. We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

**Overdrafts -** You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. Fees for overdrafts are also referred to as insufficient funds fees or uncollected funds fees depending on whether the balance in your account was negative or unavailable at the time of the overdraft. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

If you withdraw funds (i) via check, (ii) at the teller line, (iii) at an ATM or (iv) by some other electronic means, or otherwise debit your account in an amount that exceeds your available balance, we may, at our sole discretion, pay or return the check or debit. We will not be liable to you or any other person if we choose to pay or return such a check or debit. If we pay the check or debit, you agree to repay the overdraft immediately and you further agree that the overdraft and any overdraft/insufficient available funds fee may be repaid out of any subsequent deposit to your account, including direct deposits of Social Security or other government benefits, set off against any such deposit or offset against any account you have with the bank. We are under no obligation to permit overdrafts. Regardless of whether we choose to pay or return the check or debit, you agree that we may charge to and debit from your account an overdraft/insufficient available funds fee as provided in our fee schedule. If, however, your account is set up with an overdraft line of credit or the ability to make automatic transfers from another account to cover overdrafts, then checks or debits that would create an overdraft on your account will be honored in accordance with our Reserve Link (overdraft line of credit) Agreement or with the amount of available funds in the linked account. If you have "opted in" to the MB Guard My Card service on your account, payment of your overdraft item caused by an ATM transaction or a one time debit card transaction will be a non-contractual courtesy, however, payment of any overdraft is at the discretion of the bank.

**Multiple signatures, electronic check conversion, and similar transactions -** An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions the check or similar item is either removed from circulation (truncated) or given back to you. As a result, we have no opportunity to

review the check or examine the signatures on the item. You agree that, as to these or any items as to which we have no opportunity to examine the signatures, you waive any requirement of multiple signatures.

**OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We reserve the right to refuse some forms of ownership on any or all of our accounts. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account -** is an account in the name of one person.

**Joint Account - With Survivorship (And Not As Tenants In Common) -** is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - No Survivorship (As Tenants In Common) -** is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the "number of signatures" necessary for withdrawal.

**Revocable Trust or Pay-On-Death Account (for Illinois) -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries of either of these account types cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of the owner(s) of the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either a Pay-On-Death or Revocable Trust account reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Revocable Trust Account/In Trust For (pursuant to the Multiple Party Account statutes in _Indiana Code_ ch. 32-17-11 et. seq.) (for Indiana) -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Pay-on-Death Account with LDPS (pursuant to the Transfer on Death Property Act statutes in _Indiana Code_ ch. 32-17-14 et. seq.) (for Indiana) -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless all persons creating the account die. If a named beneficiary does not survive all persons that created the account, that beneficiary's right to a transfer on death transfer belongs to that beneficiary's lineal descendants per stirpes (LDPS) who survive all persons that created the account. LDPS means that group of people that are the lineal descendants of a beneficiary who will take, in place of the beneficiary they have survived, the beneficiary's share as determined under Indiana law. In order for a lineal descendant to take in place of a beneficiary, the lineal descendant must survive the death of that beneficiary. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Pay-on-Death Account No LDPS (pursuant to the Transfer on Death Property Act statutes in _Indiana Code_ ch. 32-17-14 et. seq.) (for Indiana) -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, beneficiaries will own this account in equal shares unless otherwise designated in writing, without right of survivorship. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Additional Transfer on Death Property Act Rules (for Indiana) -** If there are multiple primary beneficiaries and a primary beneficiary does not survive all persons creating the account and does not have a substitute under the LDPS rules, the share of the nonsurviving primary beneficiary is allocated among the surviving primary beneficiaries in the proportion that their shares bear to each other. If there are no surviving primary beneficiaries and there are no substitutes for the nonsurviving primary beneficiaries under the LDPS rules, the property belongs to the surviving contingent beneficiaries in equal shares or according to the percentages or fractional shares stated in the designation. If there are multiple contingent beneficiaries and a contingent beneficiary does not survive all persons creating the account and does not have a substitute under the LDPS rules, the share of the nonsurviving contingent beneficiary is allocated among the surviving contingent beneficiaries in the proportion that their shares bear to each other. If no beneficiary survives all persons creating the account, the property belongs to the estate of the owner unless directed to a substitute beneficiary under the LDPS rules.

**Revocable Trust Account (for Pennsylvania) -** If two of you create such an account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two beneficiaries are named and survive the death of all persons creating the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating this account type reserve the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**BUSINESS, ORGANIZATION AND ASSOCIATION ACCOUNTS -** Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. You represent that you have the authority to open and conduct business on this account on behalf of the entity. We may require the governing body of the entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the entity.

**STOP PAYMENTS -** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept an order to stop payment on any item from any one of you. You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. When you place your stop-payment order we will tell you what information we need to stop payment. This information must be exact since stop-payment orders are handled by computers. If your information is not exact your order will not be effective and we will not be responsible for failure to stop payment.

You may stop payment on any item drawn on your account whether you sign the item or not. Generally, if your stop-payment order is given to us verbally it is effective for six months. Your order will lapse after that time if you do not renew the order before the end of the six-month period. We are not obligated to notify you when a stop-payment order expires. A renewal of the stop-payment request may be made only by the person who initiated the stop-payment order.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**TRANSFER LIMITATIONS -** For savings and money market accounts you may make up to six transfers or withdrawals by means of a preauthorized, automatic, or telephonic transfer to another account of yours or to a third party or by check, debit card, or similar order to a third party during any calendar month (or statement cycle of at least four weeks). A preauthorized transfer includes any arrangement with us to pay a third party from your account at (i) a predetermined time; (ii) on a fixed schedule or (iii) upon oral or written orders including orders received through the automated clearing house (ACH). If the transfer or withdrawal is initiated in person, by mail, or at an ATM then there is no limit on the number of payments that may be made directly to you, directly to us for amounts you owe us, or transfers to other accounts you have with us. Withdrawals by phone are also unlimited if you are requesting that a check be mailed to you.

**AMENDMENTS AND TERMINATION (for Illinois and Indiana) -** We may change any term of this agreement at any time. We may add new terms and conditions and we may delete or amend existing terms and conditions. If we change this Agreement, the then-current version of this Agreement supersedes all prior versions and contains the terms governing your account. If you continue to use your account or keep it open, you are deemed to accept and agree to the change and are bound by the change. Rules governing changes in interest rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. We may also close this account at any time with or without reasonable notice to you and tender of the account balance personally or by mail. Items presented for payment after the account is closed may be dishonored. When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items to be paid from the account. Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. You agree to keep us informed of your current address at all times. Notice from us to any one of you is notice to all of you. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

**AMENDMENTS AND TERMINATION (for Pennsylvania) -** We may change any term of this agreement at any time. We may add new terms and conditions and we may delete or amend existing terms and conditions. If we change this Agreement, the then-current version of this Agreement supersedes all prior versions and contains the terms governing your account. If you continue to use your account or keep it open, you are deemed to accept and agree to the change and are bound by the change. Rules governing changes in interest rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. We may also close this account at any time with or without reasonable notice to you and tender of the account balance personally or by mail. Items presented for payment after the account is closed may be dishonored. When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items to be paid from the account. Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. You agree to keep us informed of your current address at all times. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

**STATEMENTS -** Statements are a valuable tool to help prevent fraudulent or mistaken transfers. Your statement will show the transactions that occurred in connection with your account during the statement period.

**Your duty to report unauthorized signatures, alterations and forgeries -** Your statement will provide sufficient information for you to reasonably identify the items paid (item number, amount, and date of payment). You should keep a record of each transaction as it is made so that when we give

you the information in the statement, you will have a complete understanding of each transaction listed.

You have some responsibilities in connection with your statement. You must examine your statement with "reasonable promptness." Also, if you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you must bear the loss entirely yourself or share the loss with us (we may have to share some of the loss if we failed to use ordinary care and if we substantially contributed to the loss). The loss you might bear, in whole or part, could be not only with respect to items listed on the statement, but also other items with unauthorized signatures or alterations by the same wrongdoer. Of course, an attempt can be made to recover the loss from the thief, but this is often unsuccessful.

You agree that the time you have to examine your statement and report to us will depend on the circumstances, but you will not, in any circumstance, have a total of more than 30 days from when we first send or make the statement available to you.

For our corporate checking accounts, we recommend our Positive Pay service as a vital tool for reducing the risks of loss from unauthorized, altered and counterfeit checks. If you do not use our Positive Pay service, you will be assuming the risk of all losses which could be prevented by the use of our Positive Pay service.

You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. This 60-day limitation is without regard to whether we exercised ordinary care. The limitation in this paragraph is in addition to those contained in the second paragraph of this section.

Contact us if you do not receive your regular statement. If this is a business account, you agree that you will have at least two people review your statements, notices, and returned checks, or in the alternative, the person who reviews these will be someone who does not have authority to transact business on the account.

**Your duty to report other errors -** In addition to the Commercial Code and other state law, you agree there is a common law duty to promptly review your statement for errors in addition to unauthorized signatures, alterations or forgeries. Promptly reviewing your statement is valuable to both you and us because it can help identify, correct and prevent future mistakes.

In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error - such as an encoding error. You agree that the time you have to examine your statement and report to us will depend on the circumstances. However, such time period shall not exceed 60 days. Failure to examine your statement and report any such errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any such errors on items identified in that statement and as between you and us the loss will be entirely yours. If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the 60 day time period to report other errors.

**Errors relating to electronic fund transfers or substitute checks -** For information on errors relating to electronic fund transfers (e.g., computer, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution. For information on errors relating to a substitute check you received, refer to your disclosure entitled Substitute Checks and Your Rights.

**ACCOUNT TRANSFER -** If you attempt to transfer or assign all or a part of your account, we will not be bound by the transfer or assignment until we agree in writing to the transfer or assignment. We are not required to accept or recognize any transfer or assignment. Unless we agree otherwise in writing, any rights of a transferee or assignee will be subject to our right of setoff or prior security interest. We have no obligation to notify you or any other person before disbursing any funds from your account in accordance with what we in good faith believe to be the terms of the transfer or assignment.

**SETOFF -** We may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt you owe us now or in the future, by any of you having the right of withdrawal, to the extent of such persons' or legal entity's right to withdraw. If the debt arises from a note, "any due and payable debt" includes the total amount of which we are entitled to demand payment under the terms of the note at the time we set off, including any balance the due date for which we properly accelerate under the note.

This right of setoff does not apply to this account if prohibited by law. For example, the right of setoff does not apply to this account if: (a) it is an Individual Retirement Account or similar tax-deferred account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.

**CONVENIENCE DEPOSITOR (Individual Accounts only) (for Illinois) -** A single individual is the owner. The convenience depositor is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the convenience depositor may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the convenience depositor. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

The owner may terminate the authorization at any time, and the authorization is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the convenience depositor until: (a) we have received written notice or have actual knowledge of the termination of authority, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of a convenience depositor.

**AUTHORIZED SIGNER (Individual Accounts only) (for Indiana) -** A single individual is the owner. The authorized signer is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the authorized signer may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the authorized signer. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

The owner may terminate the authorization at any time, and the authorization is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the authorized signer until: (a) we have received written notice or have actual knowledge of the termination of authority, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of an authorized signer.

**AUTHORIZED SIGNER (Individual Accounts only) (for Pennsylvania) -** A single individual is the owner. The authorized signer is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the authorized signer may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the authorized signer. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf. The designation of an authorized signer does not create a power of attorney; therefore, the authorized signer is not subject to the provisions of 20 Pa.C.S.A. Section 5601 et seq. (Chapter 56; Decedents, Estates and Fiduciaries Code).

The owner may terminate the authorization at any time, and the authorization is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the authorized signer until: (a) we have received written notice or have actual knowledge of the termination of authority, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of an authorized signer.

**RESTRICTIVE LEGENDS -** The automated processing of the large volume of checks we receive prevents us from inspecting or looking for special instructions or "restrictive legends" on every check. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1,000.00." For this reason, we are not required to honor any restrictive legend placed on checks you write unless we have agreed in writing to the restriction. We are not responsible for any losses, claims, damages, or expenses that result from your placement of these or other special instructions on your checks.

**PAYMENT ORDER OF ITEMS -** The law permits us to pay items (such as electronic transactions, checks, drafts or other debits) drawn on your account in any order. To assist you in handling your account with us, we are providing you with the following information regarding how we process the items that you initiate. When processing items drawn on your account, our policy is to pay them in a certain order in accordance with the following categories: First, we will pay all ATM transactions; Second, we will pay debit card transactions; Third, we will pay electronic fund transfers initiated by third parties, including checks that you write to retailers that you authorize to be converted into electronic checks; Fourth, we will pay checks you write or withdrawals you initiate against your account that are presented for payment at our bank; Fifth, we will pay on-line bill payments; and Sixth, we will pay other checks that you write against your account. Within each of the preceding six categories, those transactions without check numbers are paid first, in the order that they are received by the bank. These transactions include electronic items such as ATM transactions, electronic funds transfers and online bill payments. Transactions with check numbers are paid next, in check number order. For example, when processing checks drawn on your account, our policy is to pay the lowered numbered checks first, then in ascending order to the transaction with the highest check number. The order in which items are paid is important if there is not enough money in your account to pay all of the items that are presented. If an item is presented without sufficient funds in your account to pay it, we may, at our discretion, pay the item (creating an overdraft) or return the item NSF. The amounts of the overdraft and NSF fees are disclosed elsewhere. We encourage you to make careful records and practice good account management. This will help you to avoid initiating ATM or POS transactions, writing checks or drafts, or authorizing other types of debits without sufficient funds and incurring the resulting fees.

**CHECK PROCESSING -** We process items mechanically by relying solely on the information encoded in magnetic ink along the bottom of the items. This means that we do not individually examine all of your items to determine if the item is properly completed, signed and indorsed or to determine if it contains any information other than what is encoded in magnetic ink. You agree that we have not failed to exercise ordinary care solely because we use our automated system to process items and do not inspect all items processed in such a manner. Using an automated process helps us keep costs down for you and all account holders.

**CHECK CASHING -** We may charge a fee for anyone that does not have an account with us, per our non-customer check cashing policy, where we agree to cash a check, draft or other instrument written on your account. We may also require reasonable identification to cash such a check, draft or other instrument. We can decide what identification is reasonable under the circumstances and such identification may be documentary or physical and may include collecting a thumbprint or fingerprint.

**DEATH OR INCOMPETENCE -** You agree to notify us promptly if any person with a right to withdraw funds from your account(s) dies or becomes legally incompetent. You may continue to honor your checks, items, and instructions until: (a) we know of your death or incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You agree that we may pay or certify checks drawn on or before the date of death or legal incompetence for up to ten (10) days after your death or legal incompetence unless ordered to stop payment by someone claiming an interest in the account.

**EARLY WITHDRAWAL PENALTIES (and involuntary withdrawals) -** We may impose early withdrawal penalties on a withdrawal from a time account even if you don't initiate the withdrawal. For instance, the early withdrawal penalty may be imposed if the withdrawal is caused by our setoff against funds in the account as a result of an attachment or other legal process.

We may close your account and impose the early withdrawal penalty on the entire account balance in the event of a partial early withdrawal. See your notice of penalty for early withdrawals for additional information.

**WAIVER OF NOTICES -** You waive any notice of non-payment, dishonor or protest regarding any items credited to or charged against your account unless such notice is required by law.

**ACH AND WIRE TRANSFERS -** This agreement is subject to Article 4A of the Uniform Commercial Code - Fund Transfers as adopted in the state in which you have your account with us. If you originate a fund transfer and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. If we receive a payment order to credit an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit.

**FACSIMILE SIGNATURES -** Unless you make advance arrangements with us, we have no obligation to honor facsimile signatures on your checks or other orders. If we do agree to honor items containing facsimile signatures, you authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that are drawn on us. You give us this authority regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose. You must notify us at once if you suspect that your facsimile signature is being or has been misused.

**STALE-DATED CHECKS -** We are not obligated to, but may at our option, pay a check, other than a certified check, presented for payment more than six months after its date. If you do not want us to pay a stale-dated check, you must place a stop-payment order on the check in the manner we have described elsewhere.

**FDIC INSURANCE -** Funds in your account(s) with us are insured by the Federal Deposit Insurance Corporation (FDIC) and backed by the full faith and credit of the United States. The amount of insurance coverage you have depends on the number of accounts you have with us that are of different "ownership." An individual account is one unique form of "ownership"; a joint account, a pay-on-death account, and a self directed qualified retirement account (e.g., an IRA) are examples of some of the others. Deposit insurance for a person's self directed qualified retirement account is up to $250,000. (An IRA is a self directed qualified retirement account as is an account where the owner decides where and how to invest the balance.) Funds are insured to $250,000 per depositor for the total of funds combined in all of your other insured accounts with us. If you want a more detailed explanation or additional information, you may ask us or contact the FDIC. You can also visit the FDIC website at www.fdic.gov and click on the Deposit Insurance link. This link includes detailed contact information as well as a deposit insurance estimator.

**INDORSEMENTS -** We may accept for deposit any item payable to you or your order, even if they are not indorsed by you. We may give cash back to any one of you. We may supply any missing indorsement(s) for any item we accept for deposit or collection, and you warrant that all indorsements are genuine.

To ensure that your check or share draft is processed without delay, you must indorse it (sign it on the back) in a specific area. Your entire indorsement (whether a signature or a stamp) along with any other indorsement information (e.g. additional indorsements, ID information, driver's license number, etc.) must fall within 1½" of the "trailing edge" of a check.

As you look at the front of a check, the "trailing edge" is the left edge. When you flip the check over, be sure to keep all indorsement information within 1½" of that edge.



```
                                          7654
  Name
  Address, City, State      _____ 20 ___
  Pay to the
  order of                       $ _____
  _____ dollars

  Bank Name
  and Location
  Memo_____

  ⑈①23456789⑈   7654
```
FRONT OF CHECK

——————————— TRAILING EDGE

YOUR INDORSEMENT MUST
BE WITHIN THIS AREA

◄— 1 ½" —►     Keep your indorsement
               out of this area.

BACK OF CHECK

It is important that you confine the indorsement information to this area since the remaining blank space will be used by others in the processing of the check to place additional needed indorsements and information. You agree that you will indemnify, defend, and hold us harmless for any loss, liability, damage or expense that occurs because your indorsement, another indorsement or information you have printed on the back of the check obscures our indorsement.

These indorsement guidelines apply to both personal and business checks.

**UTMA ACCOUNTS -** Under the Uniform Transfers to Minors Act, the funds in the account are owned by the child who has unconditional use of the account when he or she reaches the age of majority. Before that time, the account may be accessed only by the custodian (or successor custodian), and the funds must be used for the benefit of the child. We, however, have no duty or agreement whatsoever to monitor or insure that the acts of the custodian (or successor custodian) are for the child's benefit. For this type of account, the child's SSN/TIN is used for the Backup Withholding Certification.

**FIDUCIARY ACCOUNTS -** Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters.

**CASH TRANSACTION REPORTING -** To help law enforcement agencies detect illegal activities, the law requires all financial institutions to gather and report information on some types of cash transactions. If the information we need to complete the report is not provided, we are required to refuse to handle the transaction. If you have any questions regarding these rules, please contact your local Internal Revenue Service office.

**BACKUP WITHHOLDING/TIN CERTIFICATION -** Federal tax law requires us to report interest payments we make to you of $10 or more in a year, and to include your taxpayer identification number (TIN) on the report. Interest includes dividends, interest and bonus payments for purposes of this rule. Therefore, we require you to provide us with your TIN and to certify that it is correct. The TIN is either a social security number (SSN) or an employer identification number (EIN). For most organization and business

accounts other than sole proprietorships, the appropriate TIN is the EIN of the organization or business entity. For sole proprietorships, either the SSN or the EIN is appropriate. However, we must supply the IRS with both the individual owner's name and the business name of the sole proprietorship. The appropriate TINs for various other types of accounts are:

Account type - TIN

Individual - SSN of the individual.

Joint Account - SSN of the owner named first on the account.

Uniform Gift/Transfer to Minor - SSN of the minor.

Informal (Revocable) Trust - SSN of the owner.

In some circumstances, federal law requires us to withhold and pay to the IRS a percentage of the interest that is earned on funds in your accounts. This is known as backup withholding. We will not have to withhold interest payments when you open your account if you certify your TIN and certify that you are not subject to backup withholding due to underreporting of interest. We may subsequently be required to begin backup withholding if the IRS informs us that you supplied an incorrect TIN or that you underreported your interest income. If you do not have a TIN, we may defer backup withholding if you certify that you do not have a TIN but have applied for one. However, we must begin backup withholding if you do not supply us with a certified TIN within 60 days. If you do not have a TIN because you are a foreign person (either an individual who is a nonresident alien or a foreign organization) you must certify your foreign status. If you are an exempt payee (receiver of interest payments), you do not need to certify your TIN, but you will have to certify your exempt status and supply us with your TIN. The most common exempt payees are corporations, organizations exempt from tax under Section 501(a), and an individual retirement plan or a custodial account under Section 403(b)(7). If you do not supply us with the appropriate TIN, we may refuse to open your account.

**CREDIT VERIFICATION -** You agree that we may verify credit and employment history by any necessary means, including preparation of a credit report by a credit reporting agency.

**LOST, DESTROYED, OR STOLEN CERTIFIED, CASHIER'S, OR TELLER'S CHECKS (for Illinois and Indiana) -** Under some circumstances you may be able to assert a claim for the amount of a lost, destroyed, or stolen certified, cashier's or teller's check. To assert the claim: (a) you must be the remitter (or drawer of a certified check) or payee of the check, (b) we must receive notice from you describing the check with reasonable certainty and asking for payment of the amount of the check, (c) we must receive the notice in time for us to have a reasonable opportunity to act on it, and (d) you must give us a declaration (in a form we require) of your loss with respect to the check. You can ask us for a declaration form. Even if all of these conditions are met, your claim may not be immediately enforceable. We may pay the check until the ninetieth day after the date of the check (or date of acceptance of a certified check). Therefore, your claim is not enforceable until the ninetieth day after the date of the check or date of acceptance, and the conditions listed above have been met. If we have not already paid the check, on the day your claim is enforceable we become obligated to pay you the amount of the check. We will pay you in cash or issue another certified check.

At our option, we may pay you the amount of the check before your claim becomes enforceable. However, we will require you to agree to indemnify us for any losses we might suffer. This means that if the check is presented after we pay your claim, and we pay the check, you are responsible to cover our losses. We may require you to provide a surety bond to assure that you can pay us if we suffer a loss.

**TRANSACTIONS BY MAIL -** You may deposit checks by mail. You should indorse the check being sent through the mail with the words "For Deposit Only" and should include your correct account number underneath to ensure the check is credited to the correct account. You should use the pre-encoded checking deposit slips found behind your checks in your checkbook. If you do not use your deposit slip or provide us with instructions indicating how or where the check should be credited, we may apply it to any account or any loan balance you have with us or we may return the check to you. Receipts for such transactions will be mailed to you only if a self-addressed stamped envelope is provided. Following your deposit, examine your statement carefully or call us to ensure that we received the item. Do not send cash through the mail for deposit.

**LEGAL ACTIONS AFFECTING YOUR ACCOUNT -** If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions.

**CHECK STORAGE AND COPIES -** You agree that you will not receive your canceled checks. We will store your canceled checks or copies of them for a reasonable retention period. You may request copies from us in the manner we require.

**TRUNCATION, SUBSTITUTE CHECKS, AND OTHER CHECK IMAGES -** If you truncate an original check and create a substitute check, or other paper or electronic image of the original check, you warrant that no one will be asked to make payment on the original check, a substitute check or any other electronic or paper image, if the payment obligation relating to the original check has already been paid. You also warrant that any substitute check you create conforms to the legal requirements and generally accepted specifications for substitute checks. You agree to retain the original check in conformance with our internal policy for retaining original checks. You agree to indemnify us for any loss we may incur as a result of any truncated check transaction you initiate. We can refuse to accept substitute checks that have not previously been warranted by a bank or other financial institution in conformance with the Check 21 Act. Unless specifically stated in a separate agreement between you and us, we do not have to accept any other electronic or paper image of an original check.

**SECURITY -** It is your responsibility to protect the account number(s) and access device(s) (e.g., an ATM card, point-of-sale card and/or PIN) for your account(s). Do not discuss, compare, or share information about your account number(s) or access device(s) with anyone unless you are willing to give them full use of your money. Checks and electronic withdrawals are processed by automated methods, and anyone who obtains your account number or access device could use it to withdraw money from your account, with or without your permission.

You agree that if we offer you services appropriate for your account to help identify and limit fraud or other unauthorized transactions against your account, such as positive pay or commercially reasonable security procedures, and you reject those services, you will be responsible for any fraudulent or unauthorized transactions which could have been prevented by the services we offered, unless we acted in bad faith or to the extent our negligence contributed to the loss.

**Account numbers -** Thieves can encode your account number on a check which looks and functions like an authorized check and can be used to withdraw money from your account. Your account number can also be used to issue a "remotely created check." Like a typical check, a remotely created check (sometimes called a telecheck, preauthorized draft or demand draft) is a draft or check that can be used to withdraw money from your account. Unlike a typical check or draft, however, a remotely created check is not issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner). For example, if you provide your account number in response to a telephone solicitation, the telephone solicitor can use the account number to issue a remotely created check to withdraw money from your account. If you have fully authorized the remotely created check (to purchase a service or merchandise, for example), it is properly payable. But it can be risky to authorize a remotely created check. A swindler could issue a remotely created check in an amount greater than you authorized, or issue additional remotely created checks that you have not authorized. We will not know if the withdrawal is unauthorized or in an amount greater than the amount you have authorized. Payment can be made from your account even though you did not contact us directly and order the payment.

**Access devices -** If you furnish your access device and grant actual authority to make transfers to someone who then exceeds that authority, you will be liable for the transfers unless we have been notified that transfers by that person are no longer authorized. Please review the additional information you have received or will receive regarding transfers by access device.

**Blank checks -** You must also take precaution in safeguarding your blank checks. Notify us at once if you think your blank checks have been lost or stolen. As between you and us, if you are negligent in safeguarding your checks, you must bear the loss entirely yourself, or share the loss with us if we failed to use ordinary care which substantially contributes to the loss.

**UNLAWFUL INTERNET GAMBLING NOTICE -** Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

**MONITORING AND RECORDING TELEPHONE CALLS -** We may monitor or record phone calls for security reasons and to ensure that you receive courteous and efficient service. You consent in advance to any such recording. We need not remind you of our recording before each phone conversation.

**TELEPHONIC INSTRUCTIONS -** Unless required by law or we have agreed otherwise in writing, we are not required to act upon instructions you give us via facsimile transmission or leave by voice mail or on a telephone answering machine.

**CLAIM OF LOSS -** If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your account, the transaction, and the circumstances surrounding the loss. You will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you.

You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources.

**ADDRESS OR NAME CHANGES -** You are responsible for notifying us of any change in your address or your name. Unless we agree otherwise, change of address or name must be made in writing by at least one of the account holders. Informing us of your address or name change on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent address you have provided to us. If provided elsewhere, we may impose a service fee if we attempt to locate you.

**RESOLVING ACCOUNT DISPUTES -** We may place an administrative hold on the funds in your account (refuse payment or withdrawal of the funds) if it becomes subject to a claim adverse to (1) your own interest; (2) others claiming an interest as survivors or beneficiaries of your account; or (3) a claim arising by operation of law. The hold may be placed for such period of time as we believe reasonably necessary to allow a legal proceeding to determine the merits of the claim or until we receive evidence satisfactory to us that the dispute has been resolved. We will not be liable for any items that are dishonored as a consequence of placing a hold on funds in your account for these reasons.

**RELEASE OF ACCOUNT INFORMATION -** You understand that in addition to information released to comply with the law or a court order, some information about your account may be disclosed to others. We may also provide information about your account to verify information you may have given in a credit application, verify for a merchant a check you have written, or in response to requests by our agents, such as independent auditors, consultants or attorneys. Please refer to the separate privacy disclosure for more information.

**CHARGEBACKS -** The bank may charge you for any item cashed against or credited to your account for which we do not receive final payment. The bank may charge you for each chargeback as provided in our fee schedule. If a claim is made against any item after it has been paid, the bank may withhold the amount of the item from your account until a final determination of the claim is made. You agree to indemnify and hold the bank harmless against any losses resulting from non-payment of any item cashed against or deposited into your account and against all losses due to any pre-authorized credit to your account that is not received by the bank. These losses include, but are not limited to, all related costs and expenses and attorney fees including the cost of any attorney employed by us.

**NOW AND DEMAND DEPOSIT ACCOUNT ORGANIZATION -** We have organized NOW accounts and Demand Deposit accounts in a nontraditional way. NOW accounts and Demand Deposit accounts consist of two subaccounts. One of these is a transaction subaccount (e.g., a checking subaccount). You will transact business on this subaccount. The other is a nontransaction subaccount (e.g., a savings subaccount). You cannot directly access the nontransaction subaccount, but you agree that we may automatically, and without a specific request from you, initiate individual transfers of funds between subaccounts from time to time at no cost to you. This account organization will not change the amount of federal deposit insurance available to you, your available balance, the information on your periodic statements, or the interest calculation, if this is an interest-bearing account. You will not see any difference between the way your NOW or Demand Deposit account operates and the way a traditionally organized NOW or Demand Deposit account operates, but this organization makes us more efficient and helps to keep costs down.

**FUNDS TRANSFERS -** The terms used in this section have the meaning given to them in Article 4A of the Uniform Commercial Code - Funds Transfers (UCC 4A). This section will generally not apply to you if you are a consumer. However, even if you are a consumer, this section will apply to that part of any funds transfer that is conducted by Fedwire. This section is subject to UCC 4A as adopted in the state in which you have your deposit with us. This agreement is also subject to all clearing house association rules, rules of the Board of Governors of the Federal Reserve System and their operating circulars. If any part of this agreement is determined to be unenforceable, the rest of the agreement remains effective. This agreement controls funds transfers unless supplemented or amended in a separate written agreement signed by us. This agreement does not apply to a funds transfer if any part of the transfer is governed by the Electronic Fund Transfer Act of 1978 (EFTA), except this agreement does apply to a funds transfer that is a remittance transfer as defined in EFTA unless the remittance transfer is an electronic fund transfer as defined in EFTA.

**Funds transfer -** A funds transfer is the transaction or series of transactions that begin with the originator's payment order, made for the purpose of making payment to the beneficiary of the order. A funds transfer is completed by the acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary of the originator's order. You may give us a payment order orally, electronically, or in writing, but your order cannot state any condition to payment to the beneficiary other than the time of payment.

**Authorized account -** An authorized account is a deposit account you have with us that you have designated as a source of payment of payment orders you issue to us. If you have not designated an authorized account, any account you have with us is an authorized account to the extent that payment of the payment order is not inconsistent with the use of that account.

**Acceptance of your payment order -** We are not obligated to accept any payment order that you give us, although we normally will accept your payment order if you have a withdrawable credit in a withdrawable account sufficient to cover the order. If we do not execute your payment order, but give you notice of our rejection of your payment order after the execution date or give you no notice, we are not liable to pay you as restitution any interest on a withdrawable credit in a non-interest-bearing account.

**Cutoff time -** If we do not receive your payment order or communication canceling or amending a payment order before our cutoff time on a funds transfer day for that type of order or communication, the order or communication will be deemed to be received at the opening of our next funds transfer business day.

**Payment of your order -** If we accept a payment order you give us, we may receive payment by automatically deducting from any authorized account the amount of the payment order plus the amount of any expenses and charges for our services in execution of your payment order. We are entitled to payment on the payment or execution date. Unless your payment order specifies otherwise, the payment or execution date is the funds transfer date we receive the payment order. The funds transfer is completed upon acceptance by the beneficiary's bank. Your obligation to pay your payment order is excused if the funds transfer is not completed, but you are still responsible to pay us any expenses and charges for our services. However, if you told us to route the funds transfer through an intermediate bank, and we are unable to obtain a refund because the intermediate bank that you designated has suspended payments, then you are still obligated to pay us for the payment order. You will not be entitled to interest on any refund you receive because the beneficiary's bank does not accept the payment order.

**Security procedure -** As described more fully in a separate writing, the authenticity of a payment order or communication canceling or amending a payment order issued in your name as sender may be verified by a security procedure. You affirm that you have no circumstances which are relevant to the determination of a commercially reasonable security procedure unless those circumstances are expressly contained in a separate writing signed by us. You may choose from one or more security procedures that we have developed, or you may develop your own security procedure if it is acceptable to us. If you refuse a commercially reasonable security procedure that we have offered you, you agree that you will be bound by any payment order issued in your name, whether or not authorized, that we accept in good faith and in compliance with the security procedure you have chosen.

**Duty to report unauthorized or erroneous payment -** You must exercise ordinary care to determine that all payment orders or amendments to payment orders that we accept that are issued in your name are authorized, enforceable, in the correct amount, to the correct beneficiary, and not otherwise erroneous. If you discover (or with reasonable care should have discovered) an unauthorized, unenforceable, or erroneously executed payment order or amendment, you must exercise ordinary care to notify us of the relevant facts. The time you have to notify us will depend on the circumstances, but that time will not in any circumstance exceed 14 days from when you are notified of our acceptance or execution of the payment order or amendment or that your account was debited with respect to the order or amendment. If you do not provide us with timely notice you will not be entitled to interest on any refundable amount. If we can prove that you failed to perform either of these duties with respect to an erroneous payment and that we incurred a loss as a result of the failure, you are liable to us for the amount of the loss not exceeding the amount of your order.

**Identifying number -** If your payment order identifies an intermediate bank, beneficiary bank, or beneficiary by name and number, we and every receiving or beneficiary bank may rely upon the identifying number rather than the name to make payment, even if the number identifies an intermediate bank or person different than the bank or beneficiary identified by name. Neither we nor any receiving or beneficiary bank have any responsibility to determine whether the name and identifying number refer to the same financial institution or person.

**Record of oral or telephone orders -** You agree that we may, if we choose, record any oral or telephone payment order or communication of amendment or cancelation.

**Notice of credit -** If we receive a payment order to credit an account you have with us, we are not required to provide you with any notice of the payment order or the credit.

**Provisional credit -** You agree to be bound by the automated clearing house association operating rules that provide that payments made to you or originated by you by funds transfer through the automated clearing house system are provisional until final settlement is made through a Federal Reserve Bank or otherwise payment is made as provided in Article 4A-403(a) of the Uniform Commercial Code.

**Refund of credit -** You agree that if we do not receive payment of an amount credited to your account, we are entitled to a refund from you in the amount credited and the party originating such payment will not be considered to have paid the amount so credited.

**Amendment of funds transfer agreement -** From time to time we may amend any term of this agreement by giving you reasonable notice in writing. We may give notice to anyone who is authorized to send payment orders to us in your name, or to anyone who is authorized to accept service.

**Cancellation or amendment of payment order -** You may cancel or amend a payment order you give us only if we receive the communication of cancellation or amendment before our cutoff time and it is there a reasonable opportunity to act on it before we accept the payment order. The communication of cancellation or amendment must be presented in conformity with the same security procedure that has been agreed to for payment orders.

**Intermediaries -** We are not liable for the actions of any intermediary, regardless of whether or not we selected the intermediary. We are not responsible for acts of God, outside agencies, or nonsalaried agents.

**Limit on liability -** You waive any claim you may have against us for consequential or special damages, including loss of profit arising out of a payment order or funds transfer, unless this waiver is prohibited by law. We are not responsible for attorney fees you might incur due to erroneous execution of payment order.

**Erroneous execution -** If we receive an order to pay you, and we erroneously pay you more than the amount of the payment order, we are entitled to recover from you the amount in excess of the amount of the payment order, regardless of whether you may have some claim to the excess amount against the originator of the order.

**Objection to payment -** If we give you a notice that reasonably identifies a payment order issued in your name as sender that we have accepted and received payment for, you cannot claim that we are not entitled to retain the payment unless you notify us of your objection to the payment within 60 days of our notice to you.

---

# ELECTRONIC FUND TRANSFERS
## YOUR RIGHTS AND RESPONSIBILITIES

This Electronic Fund Transfer disclosure does not apply to any accounts other than consumer accounts, as defined by Regulation E.

Indicated below are types of Electronic Fund Transfers we are capable of handling, some of which may not apply to your account. Please read this disclosure carefully because it tells you your rights and obligations for the transactions listed. You should keep this notice for future reference.

**Electronic Fund Transfers Initiated By Third Parties.** You may authorize a third party to initiate electronic fund transfers between your account and the third party's account. These transfers to make or receive payment may be one-time occurrences or may recur as directed by you. These transfers may use the Automated Clearing House (ACH) or other payments network. Your authorization to the third party to make these transfers can occur in a number of ways. For example, your authorization to convert a check to an electronic fund transfer or to electronically pay a returned check charge can occur when a merchant provides you with notice and you go forward with the transaction (typically, at the point of purchase, a merchant will post a sign and print the notice on a receipt). In all cases, these third party transfers will require you to provide the third party with your account number and bank information. This information can be found on your check as well as on a deposit or withdrawal slip. Thus, you should only provide your bank and account information (whether over the phone, the Internet, or via some other method) to trusted third parties whom you have authorized to initiate these electronic fund transfers. Examples of these transfers include, but are not limited to:

- **Preauthorized credits.** You may make arrangements for certain direct deposits to be accepted into your checking, savings, or Blossom account(s).
- **Preauthorized payments.** You may make arrangements to pay certain recurring bills from your checking or savings account(s).
- **Electronic check conversion.** You may authorize a merchant or other payee to make a one-time electronic payment from your checking account using information from your check to pay for purchases or pay bills.

- **Electronic returned check charge.** You may authorize a merchant or other payee to initiate an electronic funds transfer to collect a charge in the event a check is returned for insufficient funds.

Please also see **Limitations on frequency of transfers** section regarding limitations that apply to savings accounts.

**Phone Access Line (PAL) Telephone Transfers - types of transfers -** You may access your account by telephone 24 hours a day at 1-888-422-6562 using your personal identification number, a touch tone phone, your account numbers, and your access number, to:
- transfer funds from checking to checking or savings*
- transfer funds from savings to checking or savings*
- transfer funds from line of credit to checking or savings*
- make payments from checking or savings to loan accounts with us*

*Transfer limitations: Transfers are limited to the available balance in the account that funds are being transferred from.
- get information about:
  - the account balance of checking account(s)
  - the last ten deposits to checking accounts
  - the last ten withdrawals from checking accounts
  - the account balance of savings account(s)
  - the last ten deposits to savings accounts
  - the last ten withdrawals from savings accounts
  - balances and transactions on loans and CDs

Please also see **Limitations on frequency of transfers** section regarding limitations that apply to telephone transfers.

**ATM Transfers - types of transfers, dollar limitations, and charges -** You may access your account(s) by ATM using your MasterCard Debit Card, HSA Card, ATM card, and personal identification number, to:
- make deposits to your checking account(s) or savings account(s) at ATMs we own or operate
- get cash withdrawals from your checking account(s) or savings account(s)
  - you may withdraw no more than your daily authorization limit
- transfer funds between your savings and checking account(s)
- get information about the account balance of your checking account(s) or savings account(s)

There is a charge for transactions and balance inquiries performed at ATMs we do not own or operate (waived if you meet the ATM Freedom criteria.) Please refer to our separate fee schedule for a list of fees that may apply.

Some of these services may not be available at all terminals.

Please also see **Limitations on frequency of transfers** section regarding limitations that apply to ATM transfers.

**Types of MasterCard Debit Card or HSA Card Point-of-Sale Transactions -** You may access your checking account(s) to purchase goods (in person, online, or by phone), pay for services (in person, online, or by phone), get cash from a merchant, if the merchant permits, or from a participating financial institution, and do anything that a participating merchant will accept.
- When making a purchase online or by phone, expiration dates and address must match what is on our system.

**Point-of-Sale Transactions - dollar limitations -** Using your card:
- you may not exceed your daily authorization limit in point-of-sale transactions

Please refer to our separate fee schedule for a list of fees that may apply.

Please also see **Limitations on frequency of transfers** section regarding limitations that apply to debit card transactions.

**Currency Conversion and Cross-Border Transaction Fees.** If you effect a transaction with your MasterCard®-branded debit card or HSA card in a currency other than US Dollars, MasterCard will convert the charge into a US Dollar amount. The MasterCard currency conversion procedure includes use of either a government-mandated exchange rate, or a wholesale exchange rate selected by MasterCard. The exchange rate MasterCard uses will be a rate in effect on the day the transaction is processed. This rate may differ from the rate in effect on the date of purchase or the date the transaction was posted to your account.

MasterCard charges us a Currency Conversion Assessment of 20 basis points (.2% of the transaction) for performing the currency conversion. In addition, MasterCard charges us an Issuer Cross-Border Assessment of 90 basis points (.9% of the transaction) on all cross-border transactions regardless of whether there is a currency conversion. As a result, we charge you a Currency Conversion fee of .2% and a Cross-Border Transaction fee of .9%. These charges are at the discretion of MasterCard and are subject to change at any time. The Cross-Border Transaction fee is charged on all cross-border transactions regardless of whether there is a currency conversion. A cross-border transaction is a transaction processed through the Global Clearing Management System or the MasterCard Debit Switch in which the country of the merchant is different than the country of the cardholder.

Please refer to our separate fee schedule for additional information relating to the use of your Debit Cards.

**Advisory Against Illegal Use.** You agree not to use your card(s) for illegal gambling or other illegal purpose. Display of a payment card logo by, for example, an online merchant does not necessarily mean that transactions are lawful in all jurisdictions in which the cardholder may be located.

**Internet and Mobile Banking Transfers - types of transfers and dollar limitations -** You may access your account(s) by computer through the internet, or through the browser on your phone, by using your user identification and your password, to:
- transfer funds from checking to checking or savings
- transfer funds from savings to checking or savings
- transfer funds from line of credit to checking or savings
- make payments from checking to account(s) with us
- make payments from checking to third parties
  - a dollar limit for any single payment applies
- make payments from savings to loan account(s) with us
- get information about:
  - the account balance of checking or savings account(s)
  - deposits to checking or savings accounts
  - withdrawals from checking or savings accounts

Please also see **Limitations on frequency of transfers** section regarding limitations that apply to computer transfers.

**Health Savings Accounts (HSA).** We permit some electronic fund transfers to and/or from your HSA. The electronic fund transfers we permit are offered for the convenience of managing your HSA. However, electronically moving funds to or from your HSA – for example, depositing more than the allowable amount, or getting additional cash back on an HSA debit card transaction – can raise a variety of tax concerns. As a result, before electronically accessing any account you may have with us, it is a good practice to make sure you are using the correct access device (such as a card) or accessing the appropriate account for the transaction. Also, it is your responsibility to ensure the contributions, distributions, and other actions related to your HSA, comply with the law, including federal tax law. As always, we recommend consulting a legal or tax professional if you have any questions about managing your HSA. The terms of this disclosure are intended to work in conjunction with the HSA Agreement provided to you earlier. In the event of a conflict, the terms of the HSA Agreement control. You understand that your HSA is intended to be used for payment of qualified medical expenses. It is your responsibility to satisfy any tax liability resulting from use of your HSA for any purpose other than payment or reimbursement of qualified medical expenses. We do not monitor the purpose of any transaction to or from your HSA. Nor are we responsible for ensuring your eligibility for making contributions or receiving withdrawals are used for payment or reimbursement of qualified medical expenses. Refer to your HSA Agreement for more information relating to the use of your HSA.

**Limitations on frequency of transfers.** In addition to those limitations on transfers elsewhere described, if any, the following limitations apply:
- Transfers from a money market account to another account or to third parties by preauthorized, automatic, telephone, or computer transfer or by check or similar order to third parties are limited to six per month.
- Transfers from a savings account to another account or to third parties by preauthorized, automatic, telephone, or computer transfer are limited to six per month with no transfers by check, debit card or similar order to third parties.

**FEES**
- We do not charge for direct deposits to any type of account.

Except as indicated elsewhere, we do not charge for these electronic fund transfers.

Please refer to our separate fee schedule for fees that may apply to electronic fund transfers.

**ATM Operator/Network Fees.** When you use an ATM not owned by us, you may be charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer).

**DOCUMENTATION**
- **Terminal transfers.** You can get a receipt at the time you make any transfer to or from your account using automated teller machines or point-of-sale terminals unless not operating properly. However, you may not get a receipt if the amount of the transfer is $15 or less.
- **Preauthorized credits.** If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at 1-888-422-6562 to find out whether or not the deposit has been made.
- **Periodic statement.**

You will get a monthly account statement from us for your checking accounts.

You will get a monthly account statement from us for your savings accounts, unless there are no transfers in a particular month. In any case, you will get a statement at least quarterly.

For passbook accounts, if the only possible electronic transfers to or from your account are preauthorized credits, we do not send periodic statements. You may bring your passbook to us and we will record any electronic deposits that were made since the last time you brought in your passbook.

**PREAUTHORIZED PAYMENTS**
- **Right to stop payment and procedure for doing so.** If you have told us in advance to make regular payments out of your account, you can stop any of these payments. However, you can not stop payment on a debit card transaction. Here is how you request stop payment on a preauthorized payment:

Call or write us at the telephone number or address listed in this brochure in time for us to receive your request 3 business days or more before the payment is scheduled to be made. If you call, we may also require you to put your request in writing and get it to us within 14 days after you call.

Please refer to our separate fee schedule for the amount we will charge you for each stop-payment order you give.
- **Notice of varying amounts.** If these regular payments may vary in amount, the person you are going to pay will tell you, 10 days before each payment, when it will be made and how much it will be. (You may choose instead to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)
- **Liability for failure to stop payment of preauthorized transfer.** If you order us to stop one of these payments 3 business days or more before the transfer is scheduled, and we do not do so, we will be liable for your losses or damages.

**FINANCIAL INSTITUTION'S LIABILITY**

**Liability for failure to make transfers.** If we do not complete a transfer to or from your account on time or in the correct amount according to our agreement with you, we will be liable for your losses or damages. However, there are some exceptions. We will not be liable, for instance:
(1) If, through no fault of ours, you do not have enough money in your account to make the transfer.
(2) If you have an overdraft line and the transfer would go over the credit limit.
(3) If the automated teller machine where you are making the transfer does not have enough cash.
(4) If the terminal or system was not working properly and you knew about the breakdown when you started the transfer.

(5) If circumstances beyond our control (such as fire or flood) prevent the transfer, despite reasonable precautions that we have taken.
(6) There may be other exceptions stated in our agreement with you.

**CONFIDENTIALITY**

We will disclose information to third parties about your account or the transfers you make:
(1) where it is necessary for completing transfers; or
(2) in order to verify the existence and condition of your account for a third party, such as a credit bureau or merchant; or
(3) in order to comply with government agency or court orders; or
(4) as explained in the separate privacy disclosure.

**UNAUTHORIZED TRANSFERS**

**(a) Consumer liability.**
- *Generally.* Tell us AT ONCE if you believe your card and/or code has been lost or stolen, or if you believe that an electronic fund transfer has been made without your permission using information from your check. Telephoning is the best way of keeping your possible losses down. You could lose all the money in your account (plus your maximum overdraft line of credit). If you tell us within 2 business days after you learn of the loss or theft of your card and/or code, you can lose no more than $50 if someone used your card and/or code without your permission.

If you do NOT tell us within 2 business days after you learn of the loss or theft of your card and/or code, and we can prove we could have stopped someone from using your card and/or code without your permission if you had told us, you could lose as much as $500.

Also, if your statement shows transfers that you did not make, including those made by card, code or other means, tell us at once. If you do not tell us within 60 days after the statement was mailed to you, you may not get back any money you lost after the 60 days if we can prove that we could have stopped someone from taking the money if you had told us in time.

If a good reason (such as a long trip or a hospital stay) kept you from telling us, we will extend the time periods.
- *Additional Limits on Liability for MasterCard®-branded debit card or HSA card.* You will not be liable for any unauthorized transactions using your MasterCard®-branded debit card or HSA card if: (i) you can demonstrate that you have exercised reasonable care in safeguarding your card from the risk of loss or theft, and (ii) upon becoming aware of a loss or theft, you promptly report the loss or theft to us.

**(b) Contact in event of unauthorized transfer.** If you believe your card and/or code has been lost or stolen, call or write us at the telephone number or address listed in this brochure if you believe a transfer has been made using the information from your check without your permission.

**ERROR RESOLUTION NOTICE**

In Case of Errors or Questions About Your Electronic Transfers, Call or Write us at the telephone number or address listed in this brochure, as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer listed on the statement or receipt. We must hear from you no later than 60 days after we sent the FIRST statement on which the problem or error appeared.
(1) Tell us your name and account number (if any).
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.
(3) Tell us the dollar amount of the suspected error.

If you tell us orally, we may require that you send us your complaint or question in writing within 10 business days.

We will determine whether an error occurred within 10 business days and 20 business days if the transfer involved a new account) after we hear from you and will correct any error promptly. If we need more time, however, we may take up to 45 days (90 days if the transfer involved a new account, a point-of-sale transaction, or a foreign-initiated transfer) to investigate your complaint or question. If we decide to do this, we will credit your account within 10 business days and 20 business days if the transfer involved a new account) for the amount you think is in error, so that you will

have the use of the money during the time it takes us to complete our investigation. If we ask you to put your complaint or question in writing and we do not receive it within 10 business days, we may not credit your account. Your account is considered a new account for the first 30 days after the first deposit is made, unless each of you already has an established account with us before this account is opened.

We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation.

You may ask for copies of the documents that we used in our investigation.

MB FINANCIAL BANK N.A.
CUSTOMER SERVICE
6111 N. RIVER ROAD
ROSEMONT, IL 60018
Business Days: Monday through Friday
Excluding Federal Holidays
Phone: 1-888-422-6562
MORE DETAILED INFORMATION IS AVAILABLE
ON REQUEST

### NOTICE OF ATM/NIGHT DEPOSIT FACILITY USER PRECAUTIONS

As with all financial transactions, please exercise discretion when using an automated teller machine (ATM) or night deposit facility. For your own safety, be careful. The following suggestions may be helpful.

1. Prepare for your transactions at home (for instance, by filling out a deposit slip) to minimize your time at the ATM or night deposit facility.
2. Mark each transaction in your account record, but not while at the ATM or night deposit facility. Always save your ATM receipts. Don't leave them at the ATM or night deposit facility because they may contain important account information.
3. Compare your records with the account statements or account histories that you receive.
4. Don't lend your ATM card to anyone.
5. Remember, do not leave your card at the ATM. Do not leave any documents at a night deposit facility.
6. Protect the secrecy of your Personal Identification Number (PIN). Protect your ATM card as though it were cash. Don't tell anyone your PIN. Don't give anyone information regarding your ATM card or PIN over the telephone. Never enter your PIN in any ATM that does not look genuine, has been modified, has a suspicious device attached, or is operating in a suspicious manner. Don't write your PIN where it can be discovered. For example, don't keep a note of your PIN in your wallet or purse.
7. Prevent others from seeing you enter your PIN by using your body to shield their view.
8. If you lose your ATM card or if it is stolen, promptly notify us. You should consult the other disclosures you have received about electronic fund transfers for additional information about what to do if your card is lost or stolen.
9. When you make a transaction, be aware of your surroundings. Look out for suspicious activity near the ATM or night deposit facility, particularly if it is after sunset. At night, be sure that the facility (including the parking area and walkways) is well lighted. Consider having someone accompany you when you use the facility, especially after sunset. If you observe any problem, go to another ATM or night deposit facility.
10. Don't accept assistance from anyone you don't know when using an ATM or night deposit facility.
11. If you notice anything suspicious or if any other problem arises after you have begun an ATM transaction, you may want to cancel the transaction, pocket your card and leave. You might consider using another ATM or coming back later.
12. Don't display your cash; pocket it as soon as the ATM transaction is completed and count the cash later when you are in the safety of your own car, home, or other secure surrounding.

13. At a drive-up facility, make sure all the car doors are locked and all of the windows are rolled up, except the driver's window. Keep the engine running and remain alert to your surroundings.
14. We want the ATM and night deposit facility to be safe and convenient for you. Therefore, please tell us if you know of any problem with a facility. For instance, let us know if a light is not working or there is any damage to a facility. Please report any suspicious activity or crimes to both the operator of the facility and the local law enforcement officials immediately.

---

## YOUR ABILITY TO WITHDRAW FUNDS

This policy statement applies to "transaction" accounts. Transaction accounts, in general, are accounts which permit an unlimited number of payments to third persons and an unlimited number of telephone and preauthorized transfers to other accounts of yours with us. Checking accounts are the most common transaction accounts. Feel free to ask us whether any of your other accounts might also be under this policy.

Our policy is to make funds from your check deposits available to you on the second business day after the day we receive your deposit, with the first $200 available on the first business day after the day of your deposit. Electronic direct deposits will be available on the day we receive the deposit. Cash, wire transfers, and some specified check deposits will also be available before the second business day, as detailed below. Once the funds are available, you can withdraw them in cash and we will use the funds to pay checks that you have written.

Please remember that even after we have made funds available to you, and you have withdrawn the funds, you are still responsible for checks you deposit that are returned to us unpaid and for any other problems involving your deposit.

For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays. If you make a deposit before closing on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after closing or on a day we are not open, we will consider that the deposit was made on the next business day we are open.

### Same-Day Availability

Funds from the following deposits to your account will be available on the day we receive the deposit:
Electronic direct deposit.
Electronic (ACH) credits.
Cash.
Wire transfers.

### Next-Day Availability

Funds from the following deposits are available on the first business day after the day of your deposit:
U.S. Treasury checks that are payable to you.
Checks drawn on us.
If you make the deposit in person to one of our employees, funds from the following deposits are also available on the first business day after the day of your deposit:
State and local government checks that are payable to you if you use a special deposit slip available from a bank employee.
Cashier's, certified, and teller's checks that are payable to you if you use a special deposit slip available from a bank employee.
Federal Reserve Bank checks, Federal Home Loan Bank checks, and postal money orders, if these items are payable to you.
If you do not make your deposit in person to one of our employees (for example, if you mail the deposit), funds from these deposits will be available on the second business day after the day we receive your deposit.

### Other Check Deposits Subject to Second-Day Availability

The first $200 from a deposit of other checks will be available on the first business day after the day of your deposit. The remaining funds will be available on the second business day after the day of your deposit.

For example, if you deposit a check of $700 on a Monday, $200 of the deposit is available on Tuesday. The remaining $500 is available on Wednesday.

If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure for the type of check that you deposited.

### LONGER DELAYS MAY APPLY

Funds you deposit by check may be delayed for a longer period under the following circumstances:
We believe a check you deposit will not be paid.
You deposit checks totaling more than $5,000 on any one day.
You redeposit a check that has been returned unpaid.
You have overdrawn your account on six or more banking days in the last six months or accumulated a $5,000.00 negative balance on two or more banking days in the last six months.
There is an emergency, such as failure of computer or communications equipment.
We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the seventh business day after the day of your deposit.

### SPECIAL RULES FOR NEW ACCOUNTS

If you are a new customer, the following special rules may apply during the first 30 days your account is open.
Funds from electronic direct deposits to your account will be available on the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,000 of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over $5,000 will be available on the ninth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit.

Funds from all other check deposits will be available on the fifteenth business day after the day of your deposit.

### DEPOSITS AT AUTOMATED TELLER MACHINES

Deposits (cash or checks) can only be made at automated teller machines (ATMs) we own or operate. Funds from checks deposited will be available on the second business day after the day of deposit, except that U.S. Treasury checks that are payable to you will be available on the first business day after the day of deposit. Also, the first $200 of a deposit will be available on the first business day after the day of deposit. Checks drawn on MB Financial Bank will be available on the first business day after the day of deposit if the deposit is made at an ATM located on our premises.

All ATMs that we own or operate are identified as our machines.

---



Our Website
www.mbfinancial.com

Telephone Banking Center
1 888-i bank mb (1.888.422.6562)

Phone Access Line (PAL)
1 888-i bank mb (1.888.422.6562)

4353627-020

© 1988, 1995 Wolters Kluwer Financial Services – Bankers Systems™
Form AIB  8/4/95  Custom TCM-14s,2Bbe,3o

© 2003 MB Financial Bank

Revised 3-2015

Member
FDIC



# Exhibit B

# TRUTH IN SAVINGS DISCLOSURE

Terms following a ☐ apply only if checked.

Acct: __MB Classic Checking__

Acct #: _____

Date: _____

☐ The interest rate and annual percentage yield stated below are accurate as of the date printed above. If you would like more current rate and yield information please call us at __888-I bank MB (422-6562)__ .

This disclosure contains the rules which govern your deposit account. Unless it would be inconsistent to do so, words and phrases used in this disclosure should be construed so that the singular includes the plural and the plural includes the singular.

We reserve the right to at any time require not less than _____ days notice in writing before any withdrawal from an interest bearing account.

## ☐ FIXED RATE

☐ The interest rate for your account is _____ % with an annual percentage yield of_____ %. We will pay this rate _____.
We will not decrease this rate unless we first give you at least 30 days notice in writing.

☐ The interest rate and annual percentage yield for your account depend upon the applicable rate tier. We will pay these rates _____
_____.
We will not decrease these rates unless we first give you at least 30 days notice in writing.

## ☐ VARIABLE RATE

☐ The interest rate for your account is _____ % with an annual percentage yield of_____ %. Your interest rate and annual percentage yield may change.

☐ The interest rate and annual percentage yield for your account depend upon the applicable rate tier. The interest rate and annual percentage yield for these tiers may change.

### Determination of rate

☐ At our discretion, we may change the interest rate on your account.

☐ The interest rate for your account_____
_____
_____
_____ .

☐ The fixed initial rate is not determined by this rule.
☐ The initial interest rate on your account_____
_____
_____
_____
_____ .

Subsequent rates _____

_____
_____ .

### Frequency of rate change

☐ We may change the interest rate on your account _____
_____ .

☐ Your initial interest rate will not change _____
_____ .

We may change the interest rate on your account at that time and _____ thereafter.

### Limitations on rate changes

☐ The interest rate for your account will not_____ by more than _____ each _____ .
☐ The interest rate will not be less than _____ % or more than _____ %.
☐ The interest rate will not _____
_____

the interest rate initially disclosed to you.

### Minimum Balance Requirements

☒ *To open the account.* You must deposit at least $ __50.00__ to open this account.

☐ *To avoid imposition of fees.*

To avoid the imposition of the _____ you must meet _____ following requirements:

☐ A _____ of $ _____ will be imposed every_____
if the balance in the account falls below $ _____
any day of the _____ .

☐ A _____ of $ _____ will be imposed every _____
if the average daily balance for the _____
_____ falls below $ _____. The average daily balance is calculated by adding the principal in the account for each day of the period and dividing that figure by the number of days in the period.

The period we use is _____ .

To avoid the imposition of the_____ you must meet _____ following requirements:

☐ A _____ of $ _____ will be imposed for_____
transaction (withdrawal, check paid, automatic transfer or payment out of your account) if the balance in the account

falls below $ _____ any day of the _____
_____ .

☐ A _____ of $ _____ will be imposed for_____
transaction (withdrawal, check paid, automatic transfer or payment out of your account) if the average daily balance for the _____ falls below

Truth in Savings Disclosure
Bankers Systems™
Wolters Kluwer Financial Services © 1992, 2009

MBRevDate 12/15/14
TSD 6/8/2010

_____ Page 1 of 2

$_____. The average daily balance is calculated by adding the principal in the account for each day of the period and dividing that figure by the number of days in the period.

The period we use is _____.

☐ *To obtain the annual percentage yield disclosed.*

☐ You must maintain a minimum balance of

$_____ in the account each day to obtain the disclosed annual percentage yield.

☐ You must maintain a minimum average daily balance of

$_____ to obtain the disclosed annual percentage yield. The average daily balance is calculated by adding the principal in the account for each day of the period and dividing that figure by the number of days in the period.

The period we use is _____.

## Compounding and Crediting

☐ *Frequency -* Interest_____ be

compounded_____.

Interest will be _____

☐ *Effect of closing an account -* If you close your account before interest is credited, you _____ receive the accrued interest.

## Balance Computation Method

☐ *Daily Balance Method.* We use the daily balance method to calculate the interest on your account. This method applies a daily periodic rate to the principal in the account each day.

☐ *Average Daily Balance Method.* We use the average daily balance method to calculate interest on your account. This method applies a periodic rate to the average daily balance in the account for the period. The average daily balance is calculated by adding the principal in the account for each day of the period and dividing that figure by the number of days in the period.

The period we use is _____.

## Accrual of interest on noncash deposits

☐ Interest begins to accrue no later than the business day we receive credit for the deposit of noncash items (for example, checks).

☐ Interest begins to accrue _____

_____ you deposit noncash items (for example, checks).

## Bonuses

☐ You will _____

as a bonus _____.

☐ You must maintain a minimum _____

_____ of $_____ to obtain the bonus.

☐ To earn the bonus, _____

_____.

## Transaction Limitations

☐ The minimum amount you may deposit is

$_____.

☐ The minimum amount you may withdraw is

$_____.

☐ During any _____,

you may not make more than _____ withdrawals or transfers to another account of yours or to a third party by means of a preauthorized or automatic transfer or telephone order or instruction, computer transfer, or by check, draft, debit card or similar order to a third party.

☐ _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

☐ You may only make _____ deposits into your account each statement cycle.

☐ You may only make _____ ATM _____ your account each statement cycle.

☐ You may only make _____ preauthorized transfers _____ your account each statement cycle.

## Additional Terms

See the following page for fees that may be imposed in connection with your account.

Truth in Savings Disclosure
Bankers Systems™
Wolters Kluwer Financial Services © 1992, 2009

MBRevDate 12/15/14
TSD 6/6/2010

_____ Page 2 of 2

**MB Classic Checking**

**Fees**

You avoid the monthly service charge of $9.95 for each monthly statement cycle in which you meet any of the following three requirements:

1. Make deposits in this account totaling $500 or more posted during your monthly statement cycle.
2. Maintain average balance[1] of $3,000 or more in this account or in a combination of this account and your other related deposit accounts listed below. [2]
3. Make a combined total of 10 payment transactions during the monthly statement cycle using either bill pay via ibankmb.com, ACH debits, PIN & signature-based debits or checks presented for payment. The transactions must post during the monthly statement cycle.

We will not charge you a monthly service charge if you incur Overdraft (OD) fees, including Non-Sufficient Funds (NSF) or Uncollected (UCF) fees, in the same monthly statement cycle.

20 free checks presented per statement cycle; $1.00 per check thereafter.

20 free online bill payments per statement cycle; $.50 per bill online payment thereafter.

To avoid the $3.00 monthly paper statement charge, e-statement and e-notice delivery is required.

Refer to the bank's fee schedule for other fees that may be imposed in connection with your account.

[1] The period we use to calculate the average balance for this account is your monthly statement cycle.
[2] Your other related deposit accounts can include personal checking, money market or savings accounts that you own. The period we use to calculate the average balance for these accounts starts with your last statement date for each related account and ends with the statement date for this account.

Truth in Savings Disclosure

Exhibit C

MB Financial Bank
550 E Sibley Blvd
Dolton, IL 60419

ACCOUNT NUMBER ████

**ACCOUNT OWNER(S) NAME & ADDRESS**
RHONDA BOONE
████

## OWNERSHIP OF ACCOUNT - CONSUMER PURPOSE
☒ INDIVIDUAL   ☐ _____
☐ JOINT - WITH SURVIVORSHIP (and not as tenants in common)
☐ JOINT - NO SURVIVORSHIP (as tenants in common)
☐ TRUST - SEPARATE AGREEMENT:

☐ REVOCABLE TRUST   OR   ☐ PAY-ON-DEATH
DESIGNATION AS DEFINED IN THIS AGREEMENT
Name and Address of Beneficiaries:

| TYPE OF ACCOUNT | ☒ NEW | ☐ EXISTING |
|---|---|---|
| | ☒ CHECKING | ☐ SAVINGS |
| | ☐ MONEY MARKET | ☐ CERTIFICATE OF DEPOSIT |
| | ☐ NOW | ☐ _____ |

This is your (check one): Free Checking
☒ Permanent   ☐ Temporary   account agreement.

Number of signatures required for withdrawal  1
FACSIMILE SIGNATURE(S) ALLOWED?   ☐ YES   ☒ NO

[
X
]

SIGNATURE(S) - The undersigned certifies the accuracy of the information he/she has provided and acknowledges receipt of a completed copy of this form. The undersigned authorizes the financial institution to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following agreement(s) and/or disclosure(s):

☒ Terms & Conditions  ☒ Truth in Savings  ☒ Funds Availability
☒ Electronic Fund Transfers  ☒ Privacy  ☐ Substitute Checks
☒ Common Features  ☐ _____

## OWNERSHIP OF ACCOUNT - BUSINESS PURPOSE
☐ SOLE PROPRIETORSHIP
☐ CORPORATION:   ☐ FOR PROFIT   ☐ NOT FOR PROFIT
☐ PARTNERSHIP
☐ _____
BUSINESS:
COUNTY & STATE
OF ORGANIZATION: _____
AUTHORIZATION DATED: _____

(1): [ _Rhonda Boone_
RHONDA BOONE
I.D. # ████   D.O.B. ████ ]

DATE OPENED ___8/23/2010___ BY _tfm152_
INITIAL DEPOSIT $ _____
   ☐ CASH   ☐ CHECK   ☐
HOME TELEPHONE # ████
BUSINESS PHONE # _____
DRIVER'S LICENSE # _____
E-MAIL ████
EMPLOYER _____
MOTHER'S MAIDEN NAME _____
Name and address of someone who will always know your location: ___

(2): [ X ]
I.D. # _____ D.O.B. _____

(3): [ X ]
I.D. # _____ D.O.B. _____

## BACKUP WITHHOLDING CERTIFICATIONS
TIN: ████
☒ TAXPAYER I.D. NUMBER - The Taxpayer Identification Number shown above (TIN) is my correct taxpayer identification number.

☒ BACKUP WITHHOLDING - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

☐ EXEMPT RECIPIENTS - I am an exempt recipient under the Internal Revenue Service Regulations.

SIGNATURE: I certify under penalties of perjury the statements checked in this section and that I am a U.S. citizen or other U.S. person (as defined in the instructions).
X _Rhonda Boone_
                              (Date)

(4): [ X ]
I.D. # _____ D.O.B. _____

☐ Authorized Signer (Individual Accounts Only)
[ X ]
I.D.# _____ D.O.B. _____